Jennifer McLAIN, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

Civ. A. No. 92–4615 (AJL).

United States District Court,
D. New Jersey.

March 26, 1993.

John Feniak, Union, NJ, for plaintiff.

Patrice Smiley Andrews, Law Offices of Joseph Trovato, Hackensack, NJ, for defendant.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Jennifer McLain ("McLain") against defendant Metropolitan Life Insurance Company ("MetLife") to recovery "Accidental Death and Dismemberment" benefits under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* A verified complaint was originally filed in the Superior Court of New Jersey, Law Division, Hudson County on 2 October 1992. Pursuant to 28 U.S.C. § 1441(a) and (b), MetLife removed this action to Federal court on 4 November 1992. Jurisdiction is alleged pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

Currently before the court are the cross motions for summary judgment of McLain and MetLife.[1] For the reasons set forth below, summary judgment is granted in favor of MetLife.

*Facts*

McLain is the widow of John McLain ("J. McLain") who died 10 June 1990. Joint 12G Statement, ¶¶ 1, 8. J. McLain was a management level employee with the American Telephone and Telegraph Company ("AT & T") until his death. *Id.,* ¶ 1. He was also a participant in the AT & T Benefits Plan (the "AT & T Plan"), which is governed by ERISA. *Id.*

MetLife is the claims administrator of the life insurance benefits of the AT & T Plan. AT & T, as the plan administrator (the "Plan Administrator"), has vested in MetLife the discretionary authority to determine life insurance benefit claim eligibility and entitlement, conduct the evaluation and the review of such denied claims, construe the Plan's terms and conduct the administration of the AT & T Plan's life insurance claim procedures. *Id.,* ¶ 2.

As Plan Administrator, AT & T has distributed to eligible AT & T Plan participants a Summary Plan Description ("SPD") which constitutes one of the AT & T Plan's documents. *Id.,* ¶ 4; Ex. J-1. MetLife also issued a contract of insurance (the "Insurance Contract") to AT & T in relation to the AT & T Plan life insurance benefits. The Insurance Contract also constitutes one of the AT & T Plan documents. Joint 12G Statement, ¶ 5; Ex. J-2.

One of the benefits of the AT & T Plan is the Accidental Death and Dismemberment benefit for which J. McLain was eligible at the time of his death. Joint 12G Statement,

---

1. In support of her motion and in opposition to the motion of MetLife, McLain submitted: Brief in Support of Plaintiff, Jennifer McLain's Motion for Summary Judgment (the "McLain Brief"), Plaintiff, Jennifer McLain's Brief in Opposition to Defendant's Notice of Motion for Summary Judgment (the "McLain Opp. Brief").

In support of its motion and in opposition to the motion of McLain, MetLife submitted: Defendant Metropolitan Life Insurance Company's Brief in Support of Summary Judgment (the "MetLife Brief"), Defendant Metropolitan Life Insurance Company's Reply Brief in Support of Summary Judgment and in Opposition to Plaintiff's Summary Judgment Motion (the "MetLife Opp. Brief").

The parties jointly submitted: Joint Stipulation of Facts (the "Joint 12G Statement"), Joint Document/Exhibit List (the "Ex.").

¶ 6; Exs. J–1, J–2. The AT & T Plan provides, in relevant part:

> Upon receipt of notice and satisfactory proof ... that any Employee ... shall have sustained accidental bodily injuries, and within ninety days thereafter shall have [died] ... as a direct result of such bodily injuries independently of all other causes, the Insurance Company shall pay, subject to the terms and limitations hereof, the amount of insurance specified ..., however, that in no case shall any payment· be made for death ... which is ..... (4) caused by or resulting from suicide, attempted suicide or intentionally self-inflicted injury.

Joint 12G Statement, ¶ 7; Ex. J–2.

J. McLain died on Sunday, 10 June 1990 at 6:30 p.m. at Greenville Hospital (the "Hospital") in Jersey City, New Jersey. He was thirty-three years old at his death. Joint 12G Statement, ¶ 8. The Jersey City Police Department Investigation Report (the "Lyons Report") of J. McLain's death states that on 10 June 1990, at 5:15 p.m., Jersey City Police Officer Peter Lyons ("Lyons") was flagged down by Robert Fahrion ("Fahrion"). Fahrion advised Lyons that J. McLain was sitting in the passenger seat of Fahrion's automobile and was ill and unconscious after playing golf. Fahrion indicated that J. McLain required hospitalization. *Id.,* ¶ 9. The Report indicates Lyons escorted Fahrion's automobile to the Hospital where emergency personnel treated J. McLain for cardiac arrest. J. McLain died at the Hospital. *Id.;* Ex. J–4.

On the evening of 10 June 1990, at or around 6:40 p.m., the Jersey City Police Department notified the Hudson County Prosecutor's Office of J. McLain's "suspicious death." According to the report of the Prosecutor's Investigator, John Bartucci ("Bartucci"), J. McLain, while playing golf, "complained of shortness of breath and not feeling well." Joint 12G Statement, ¶ 10; Ex. J–5. When J. McLain reached Gimbert's Tavern in Jersey City, he "passed out." Joint 12G Statement, ¶ 10; Ex. J–5.

Bartucci states he spoke with McLain about her husband. McLain "stated that she has been sep[a]rated from her husband for about one week" and "that her husband was on cocaine on Friday evening June 8, 1990 and was also drinking heavy. She also remembered that [J. McLain] had been using cocaine on a regular basis for a long period." Joint 12G Statement, ¶ 11; Ex. J–5.

On 11 July 1990, Dr. Sunandan B. Singh ("Dr. Singh"), Assistant Essex County Medical Examiner, performed an autopsy upon J. McLain's body and complied an autopsy report (the "Autopsy Report"). In the Autopsy Report, Dr. Singh stated that

> [a]s per details given by the wife of the decedent, ... [J. McLain] had gone to the Y.M.C.A. in the a.m. ... Had his exercise, came back home and complained of not feeling well. He picked up his golf clubs and left home ... [J. McLain] had no past medical history of problems and per the wife he is in the habit of doing cocaine and was drinking alcohol prior to his death.

Joint 12G Statement, ¶ 12; Ex. J–6.

The Autopsy Report include pathological finds regarding J. McLain:

(1) Hemorrhagic pulmonary edema.

(2) Chronic laryngitis and bronchitis.

(3) Erosive esophagitis and hemorrhagic gastritis.

(4) Mitral incompetence.

(5) History of ethanol and cocaine abuse prior to demise.

Joint 12G Statement, ¶ 13; Ex. J–6.

Initially, J. McLain's death certificate (the "Death Certificate") stated that the immediate cause of death was "Pending Toxicology and Histology." Joint 12G Statement, ¶ 14; Ex. J–3. A toxicology analysis, (the "Toxicology Report"), submitted later, states that cocaine, cocaine metabolites and alcohol were present in J. McLain's blood, that his urine sample tested positive for cocaine metabolites, that the cocaine metabolites were present in his bile, that alcohol was present in his brain, and that the nasal-swab was positive for cocaine and cocaine metabolites.[2] After

---

2. The specific findings of the Toxicology Report include:

the toxicology results became available, Dr. Singh completed an addendum to the Autopsy Report (the "Addendum Report"). The Addendum Report states that, on 25 July 1990, the death certificate was amended to read: "CAUSE OF DEATH: Acute Drug Reaction" and "MANNER OF DEATH: accident." Joint 12G Statement, ¶ 16; Ex. J–6.

On 12 June 1990, AT & T notified MetLife that J. McLain died on 10 June 1990 and that his last day of work was Friday, 8 June 1990. Joint 12G Statement, ¶ 17; Ex. J–8(a). Prior to receipt of McLain's claim for Accidental Death and Dismemberment benefits, MetLife approved a request by AT & T that an advance payment of basic life insurance benefits in the amount of $10,000 be made to McLain, as against the payable basic life insurance benefit of $35,000. On 14 June 1990, MetLife made the advance payment to McLain. Joint 12G Statement, ¶ 18; Ex. J–8(b).

McLain submitted a claim, dated 21 June 1990, for basic life insurance benefits and Accidental Death and Dismemberment benefits under the AT & T Plan. A copy of the initial Death Certificate, indicating that an investigation was pending, was attached to the claim. Joint 12G Statement, ¶ 19. On 2 August 1990, McLain submitted Dr. Singh's Addendum Report to MetLife. Id.; Ex. J–8(c).

On 7 August 1990, MetLife reviewed McLain's claim and approved payment of the remaining balance of $25,000 in basic life insurance benefits. Payment was made on 7 August 1990. Joint 12G Statement, ¶ 20; Ex. J–8(d). However, after review of J. McLain's Autopsy Report, Toxicology Report and Death Certificate, MetLife denied McLain's claim for Accidental Death and Dismemberment benefits. Joint 12G Statement, ¶ 21. By letter, dated 3 October 1990, MetLife informed McLain of its determination that J. McLain's death was not accidental under the terms of the AT & T Plan. In addition, his death was excluded under the

Plan's "purposely self-inflicted injury" exclusion. Id.; Ex. J–8(e).

In October 1990, McLain requested a review of the claim denial. McLain stated in her letter that J. McLain's death was accidental based upon the Autopsy Report and that he did not intend "to inflict self-injury at the time of [his] death." Joint 12G Statement, ¶ 22. No additional information was submitted in support of McLain's claim appeal. Id.; Ex. J–8(f).

In response to McLain's appeal, MetLife, again, reviewed McLain's claim for Accidental Death and Dismemberment benefits under the AT & T Plan. MetLife determined J. McLain's death did not constitute an accidental injury under the AT & T Plan, as his death resulted from an intentionally self-inflicted injury, as a consequence of his use of cocaine. Therefore, on 16 November 1990, MetLife wrote McLain and informed her the initial denial of her claim would be upheld. Joint 12G Statement, ¶ 23; Ex. J–8(g). McLain commenced the present action on 7 October 1992.

## Discussion

### A. Standard of Review for Summary Judgment

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); see also Desvi, Inc. v. Continental Ins. Co., 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' ") (citations omitted); Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d

BLOOD: Ethanol: 0.015%
  Benzoylecogonine: 0.100 mg/L
  Lidocaine: 0.58 mg/L; Cocaine: 0.200 mg/L
URINE: Cocaine & metabolites: Positive
BILE: Benzoylecogonine: 0.22 mg/L

BRAIN: Alcohol: 0.021%
POST–MORTEM BLOOD: Ethanol: 0.21%
  Benzoylecogonine: 0.20 mg/L
NASAL–SWAB: Cocaine & metabolites: Positive
Joint 12G Statement, ¶ 15; Ex. J–7.

Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Gray*, 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-

moving party fails to 'establish the existence' of an element essential to the case").

## B. Standard of Review for Decisions of Plan Administrator

Section 1132 of ERISA allows a participant or beneficiary to bring suit to recover benefits under a plan. The standard courts apply when reviewing claims for benefits depends on whether the benefit plan vests discretion with the administrator or fiduciary. The Supreme Court explained in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), "a denial of benefits challenged under [section] 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. If the administrator or fiduciary has been vested with discretionary authority, the arbitrary and capricious standard of review is to be applied. *Id.*

■ "In a case involving the interpretation of a provision of a pension plan, ... under the arbitrary and capricious standard, the trustee's interpretation 'should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan.'" *Moats v. United Mine Workers of America Health and Retirement Funds*, 981 F.2d 685, 688 (3d Cir.1992). A denial of benefits is arbitrary and capricious if it is "not rational and based on consideration of relevant factors." *Id.* at 687; *Shiffler v. Equitable Life Assur. Soc.*, 838 F.2d 78, 83 (3d Cir.1988) (arbitrary and capricious if denial 'clear error,' and not 'rational').

■ Discretion is generally bestowed on the administrator or fiduciary by express terms in a plan. However, the language of a plan may impliedly confer upon its administrator the discretion to make benefit eligibility determinations. *Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir.1991) (citing *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir.1989)). Courts have applied the arbitrary and capricious standard where a fidu-

ciary has discretionary authority in making eligibility determinations, even where the word "discretion" was not used in the plan. *See Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir.1991) (discretion found based on authority to "interpret and construe provisions ... determine eligibility ... make and enforce rules ... decide questions...."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir.1990) (discretion found based on authority to "administer, ... decide all questions," interpret and apply rules).

Courts have found discretionary authority conferred on an administrator who is required to determine "whether an applicant is 'disabled,' using medical evidence *satisfactory* to the [insurance] company." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir.1991) (emphasis supplied); *see also Bali v. Blue Cross and Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir.1989) (same). Discretion has been found to be conferred when the plan permits the administrator to decide "what sort of evidence may be required from the applicant to provide a basis for the subsequent ... determination." *Miller* 925 F.2d at 984; *Bali*, 873 F.2d at 1047.

In the present case, the parties stipulated MetLife is the administrator of AT & T's Plan and vested with discretionary authority to determine eligibility:

> As the Plan Administrator, AT & T has vested in MetLife the discretionary authority to determine life insurance benefit claim eligibility and entitlement, conduct the evaluation and the review of such denied claims, construe the Plan's terms, and conduct the administration of the Plan's life insurance claim procedures.

Joint 12G Statement, ¶¶ 2–3. The SPD provides MetLife "has the exclusive right to interpret the provisions of the Program/Plan." Ex. J–1 at 24. In addition, the terms of AT & T's Plan require a claimant to submit "satisfactory proof" that a decedent suffered bodily injuries as a consequence of an accident which resulted in death. MetLife must also determine whether the death resulted from an excluded cause such as "purposely self-inflicted injury." Exs. J–1 at 6; J–2 at 17–18.

It appears the terms of the AT & T Plan confer discretionary authority upon MetLife to determine eligibility for benefits. Accordingly, the standard of arbitrary and capricious governs the review of MetLife's denial of McLain's Accidental Death and Dismemberment benefits claim.[3]

C. Interpretation of Plan under ERISA

Section 514(a) provides ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a); *District of Columbia v. Greater Washington Board of Trade,* — U.S. ——, ——, 113 S.Ct. 580, 582, 121 L.Ed.2d 513 (1992). The Supreme Court has repeatedly held that "a law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) 'if it has a connection with or reference to such a plan.'" *Id.* —— U.S. at ——, 113 S.Ct. at 583; *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990); *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990).[4]

Congress intended that "courts ... develop a '[F]ederal common law of rights and obligations under ERISA-regulated plans.'" *Firestone,* 489 U.S. at 110, 109 S.Ct. at 954 (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987)). "The benefit provisions of an ERISA regulated group life insurance program must be interpreted under principles of [F]ederal substantive law." *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir.1990), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1991). Although, "[F]ederal common law on the issue of insurance benefits is still in its formative stage[, it] 'must embody common-sense canons of contract interpretation.'" *Id.* The principles of trust law guide the development of this body of Federal common law.[5] *Firestone,* 489 U.S. at 110–11, 109 S.Ct. at 953–54. As in trust law, the terms of a plan should be "determined by the provisions of the instrument as interpreted in light of all the circumstances;" questions of intent are properly considered. *Luby,* 944 F.2d at 1180 (quoting *Firestone,* 489 U.S. at 112, 109 S.Ct. at 954).[6]

**3.** Even under a *de novo* review, the result in the present case would be the same.

**4.** In keeping with the "deliberately expansive" language chosen by Congress, section 514(a) "preempts any state law that refers to or has a connection with covered benefit plans ... 'even if the law is not specifically designed to affect such plans, or the effect is only indirect,' and even if the law is 'consistent with ERISA's substantive requirements.'" *Greater Washington Board of Trade,* — U.S. at ——, 113 S.Ct. at 583 (citations omitted). A cause of action is preempted where "if there were no plan, there would have been no cause of action." *1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc. v. Nobers,* 968 F.2d 401, 407 (3d Cir.1992) (citing *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483), *cert. denied,* — U.S. ——, 113 S.Ct. 1066, 122 L.Ed.2d 370 (1993). Accordingly, state common law causes of action are expressly preempted. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987); *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989); *Shiffler,* 838 F.2d at 81; *Henry v. Black & Decker, Inc.,* 779 F.Supp. 778, 782–83 (D.N.J.1991); *Labus v. Navistar Int'l Transp. Corp.,* 740 F.Supp. 1053, 1065 (D.N.J. 1990). ERISA's broad preemption will not apply to areas of law expressly excepted, § 514(b), 28

U.S.C. § 1144(b), or to state action which "may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21; *see Henry,* 779 F.Supp. at 782. Therefore, ERISA would not preempt "a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan." *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483.

**5.** McLain relies on state court decisions discussing insurance law to guide interpretation of the terms of the AT & T Plan. McLain Brief at 5–7. As noted, the applicable model for review of ERISA claims is the law of trusts.

**6.** McLain asserts that "although ERISA is a Federal Act and Federal Court decisions control, state cases decided before ERISA must be looked at for guidance" McLain Brief at 2. Federal courts have referred to state court decisions as references for developing the Federal common law. *Wickman,* 908 F.2d at 1084; *Brown v. American Int'l Life Assur. Co.,* 778 F.Supp. 912, 916 (S.D.Miss.1991). However, when "state law threatens to subject an ERISA plan administrator or fiduciary to inconsistent obligations, the relevant state law is within the scope of ERISA's preemption clause." *McMahan v. New England*

In interpreting the provisions of an ERISA plan, the terms of the policy "must be given their plain meanings, meanings which comport with the interpretations given by the average person." *Wickman*, 908 F.2d at 1084; *see also Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 490 (1st Cir.1989). The determination of whether a term is ambiguous is a question of law. *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 92 (3d Cir.1992); *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir.1991). A term is ambiguous if it is subject to reasonable alternative interpretations. *Id.* Once a term is held to be ambiguous as a matter of law, "a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and the past practice, among other things." *Alexander*, 967 F.2d at 96; *see Taylor*, 933 F.2d at 1233–34 (ambiguous terms in ERISA severance plan will not be construed against drafter without first attempting to ascertain intent of parties).

McLain contends that the terms "accident" and "purposefully self-inflicted injury," used in the AT & T Plan are ambiguous and should be construed against MetLife. As a matter of law, neither of the terms, as used in the AT & T Plan are ambiguous. Giving these terms their "plain meanings, meanings which comport with the interpretations given by the average person," *Wickman*, 908 F.2d at 1084, they are not subject to reasonable alternative interpretations. In addition, the body of Federal law, discussed below, interpreting these phrases commonly used in accidental death and dismemberment benefit plans, supports the plain meaning apparent from the AT & T Plan.[7]

### D. Death as a Result of Accident

A prerequisite to eligibility for Accidental Death and Dismemberment benefits is that the AT & T Plan participant's death "is a result of and occurs within [ninety] days after an accident either on or off the job." Exs. J–1 at 6; J–2 at 18. It is MetLife's position that McLain never submitted proof that J. McLain's death was the result of an accident. Rather, all the proof submitted to MetLife—the Death Certificate, the Autopsy Report, the Addendum Report and the Toxicology Report—established that J. McLain "died of an acute drug reaction as a consequence of the purposeful and wholly volitional use of cocaine." MetLife Brief at 16.

Several circuits have considered the meaning of "accident" as used in plans similar to the AT & T Plan. In *Wickman*, 908 F.2d 1077, the First Circuit reviewed the denial of a claim for Accidental Death and Dismemberment benefits. The plan in *Wickman* provided that an accident was "an unexpected, external, violent and sudden event." 908 F.2d at 1081. The plan also provided claims would be denied if death was "either directly or indirectly caused by 'suicide or intentionally self-inflicted injury, whether ... sane or insane.'" *Id.* The decedent in *Wickman* died after he intentionally climbed over the guardrail of a suspension bridge, hung by one hand from the bridge and fell approximately forty to fifty feet onto the train tracks below. *Id.*

After extensive analysis, the Circuit affirmed the finding of the Magistrate Judge[8] that by climbing over the guardrail of a suspension bridge and suspending himself by one hand forty to fifty feet above the ground, the decedent "was 'substantially certain' ... he would suffer significant injuries, if not

*Mutual Life Ins. Co.*, 888 F.2d 426, 428 (6th Cir.1989). *Wickman*, 908 F.2d 1077, sets forth standards under Federal common law which govern the issues in the present case.

7. Even if the terms were ambiguous, the rule that ambiguities in an insurance policy are to be construed against the insurer, is inapplicable to cases governed by ERISA. *Alexander*, 967 F.2d at 96; *Harms v. Cavenham Forest Industries Inc.*, 984 F.2d 686 (5th Cir.1993); *Rodriquez–Ahreur v. Chase Manhattan Bank*, 986 F.2d 580, 585 (1st

Cir.1993); *Brewer v. Lincoln National Life Ins. Co.*, 921 F.2d 150, 153–53 (8th Cir.1990). *But see Masella v. Blue Cross & Blue Shield, Inc.*, 936 F.2d 98, 107 (2d Cir.1991) (construing ambiguities against drafter); *Phillips v. Lincoln National Life Ins. Co.*, 978 F.2d 302 (7th Cir.1992) (same); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538–41 (9th Cir.1990) (same).

8. The parties agreed to have the case tried before a Magistrate Judge. *Wickman*, 908 F.2d at 1081.

death.... [The decedent] knew or should have known ... serious bodily injury or death was a probable consequence substantially likely to occur as a result of his volitional act ..." and that as a matter of law, the decedent did not lose his life because of an accident as defined under the plan. *Id.* The Circuit in *Wickman* rejected the state law distinction between accidental "means" and "result." Instead, the Circuit focused on whether the decedent "either actually expected or reasonably should have expected the ultimate result which befell him." *Id.* at 1086.

In determining whether a decedent expected or should have expected the ultimate result, the Circuit declined to place particular weight on the decedent's subjective expectation. Like people who participate in a game of Russian roulette with the "fanciful expectation that fate w[ill] inevitably favor them," some subjective expectations are patently unreasonable. *Id.* at 1087. In addition, hypothesizing or speculating as to a decedent's expectation is not productive. Accordingly, the Circuit considered the subjectively and objectively reasonable expectations of the insured when the policy was purchased. *Id.* at 1088.

When considering the decedent's objective expectation, the Circuit in *Wickman* explained: "[O]ne must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* The Circuit's conclusion that the decedent "knew or should have known that serious bodily injury or death was a probabl[e] consequence substantially likely to occur as a result of his volitional act ... equates with a determination that [he] either expected the result, or that a reasonable person in his shoes would have expected the result, and that any other expectation would be unreasonable." *Id.* at 1089. *See also Brown,* 778 F.Supp. at 916 (claim for ERISA benefits;

following subjective/objective analysis of *Wickman*).

In *Patch v. Metropolitan Life Ins. Co.,* 733 F.2d 302 (4th Cir.1984) (non-ERISA, applying Virginia insurance law), the court held an unintentional death from a self-administered heroin overdose was not death by "accidental means" under the insurance policy. Focusing on the foreseeability of the consequences, rather than on the intent of the decedent, the court determined that because the dangers of heroine use are well known and the decedent, who had used heroin previously, administered the heroin "fully aware of the manifold risks involved," the decedent's death was not accidental. *But see Marsh v. Metropolitan Life Ins. Co.,* 70 Ill.App.3d 790, 27 Ill.Dec. 158, 161, 388 N.E.2d 1121, 1124 (1979) (non-ERISA, applying Illinois insurance law; self-administered heroin overdose accidental because "unexpected, undesigned and ... unintentional."); *Miller v. Continental Ins. Co.,* 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976) (non-ERISA, applying New York insurance law; self-administered heroin overdose accidental because not intentional).

Additionally, in *International Underwriters, Inc. v. Home Ins. Co.,* 662 F.2d 1084 (4th Cir.1981) (non-ERISA, applying Virginia insurance law), the court determined that death resulting from autoerotic asphyxiation was not an accident. The decedent voluntarily engaged in conduct he "was bound to have foreseen" could result in death or serious bodily injury. *Id.* at 1087.

Applying the standard described in *Wickman,* MetLife's determination that McLain did not submit satisfactory proof that J. McLain's death was the result of "accidental bodily injuries" is neither arbitrary nor capricious.[9] To determine whether J. McLain "either actually expected or reasonably should have expected" to die of an acute drug reaction, an inquiry into his subjective and objective expectations must be conducted. *Wickman,* 908 F.2d at 1086.

9. Even under a *de novo* review, MetLife's denial of eligibility for Accidental Death and Dismem-
berment benefits was appropriate.

In the absence of evidence to indicate McLain's expectations, McLain asserts her husband did not expect to die from the amount of cocaine he ingested. Rather J. McLain sought euphoria. McLain Brief at 3. However, in light of J. McLain's background and characteristics, this expectation is unreasonable.

J. McLain was thirty-three years old, educated and had a wife and family. Accordingly to McLain's own statement, her husband was "in the habit of doing cocaine." Ex. J–6. As recently as Friday 8 June 1990, J. McLain had been using cocaine and drinking heavily. He "had been using cocaine on a regular basis for a long period." *Id.* As indicated by the Addendum Report, J. McLain died as a result of an "acute drug reaction." Ex. J–6.

MetLife's argument that the voluntary ingestion of cocaine is "no less hazardous that engaging in Russian roulette or standing outside the guardrail of a high suspension bridge" is persuasive. MetLife Brief at 19. As further argued by MetLife:

The hazards of cocaine use are universally known; the horrors of drug use are paraded nightly on television, recounted in newspapers, books and magazines in great— detail, and have been the subject of numerous television movies and films.

*Id.* at 19–20. Death from cocaine related cardiac arrest is a phenomenon frequently described in the press.

This is not an instance where the victim was experimenting with cocaine for the first time. J. McLain was a habitual user of cocaine. Based on the popular knowledge of the dangers of cocaine use, J. McLain knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of the use of cocaine. Because MetLife's determination that McLain failed to submit satisfactory proof that J. McLain's death was accidental is rational and based on consideration of relevant factors, it is neither arbitrary nor capricious.

### E. Purposefully Self-inflicted Injury

The AT & T Plan also excludes from Accidental Death and Dismemberment benefits death which results "from purposefully self-inflicted injury." Ex. J–1 at 6. It is MetLife's position McLain has not submitted satisfactory evidence to demonstrate that J. McLain did not intend to kill himself or injure himself. MetLife Brief at 22.

Interpreting a similar provision in a plan, the court in *Holsinger v. New England Mutual Life Ins. Co.,* 765 F.Supp. 1279 (E.D.Mich.1991), reviewed the denial of accidental death benefits based on the decedent's death from ingestion of a quantity of codeine. Applying the principles discussed in *Wickman,* 908 F.2d 1077, the court in *Holsinger* formulated four questions for determining whether the death resulted from an "intentionally self-inflicted injury." *Id.* at 1281–82.

First, was the ingestion of drugs intentional? Second, did the decedent know that the ingestion of drugs would be likely to cause an injury? Third, did the ingestion of drugs cause an injury? Fourth, did the loss result from the injury?

*Id.*

In *Holsinger,* it was undisputed the decedent ingested the drugs intentionally. In determining whether the decedent knew of the possible injury ingestion of prescription drugs could produce, the court stated: "[I]t is not necessary that the person ingesting the drugs know that death could result. If the person ingesting the drugs has a general cognizance that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss." *Id.* The decedent in *Holsinger* knew, by way of being a pharmacist and long time drug abuser, that the ingestion of drugs would likely cause injury. The ingestion caused his death. Accordingly, the court granted summary judgment in favor of the plan. *Id. See also Sims v. Monumental General Ins. Co.,* 960 F.2d 478 (5th Cir.1992) (unintentional death from autoerotic asphyxiation constituted "intentional self-inflicted injury" even though decedent did

not mean to kill himself and had engaged in practice without injury in past; non-ERISA).

Applying the test articulated in *Holsinger* to the facts of the present case, MetLife's denial of McLain's claim for Accidental Death and Dismemberment benefits was neither arbitrary nor capricious.[10] The first inquiry is satisfied because it is undisputed that J. McLain ingested the cocaine intentionally.

In deciding the second *Holsinger* factor, it is not necessary to find that he intended to kill himself. Rather, J. McLain must have had a "general cognizance" that the ingestion of cocaine could produce some injury and that the injury and death are causally related. As discussed, J. McLain had been using cocaine for a long time. Although he was not a trained pharmacist, like the decedent in *Holsinger,* and although he had ingested cocaine in the past, apparently without serious injury, it is inconceivable that anyone, particularly a long time cocaine user, would be unaware of the dangers inherent to the use of cocaine. The Addendum Report indicates that the cause of death was an acute drug reaction; the third and fourth elements of *Holsinger* are satisfied. Accordingly, Met-Life's denial of benefits under the "purposefully self-inflicted injury" exclusion in not arbitrary and capricious.

*Conclusion*

For the reasons set forth above, summary judgment is granted in favor of MetLife.

---

**10.** Even under a *de novo* review, MetLife's denial of eligibility for Accidental Death and Dismem-berment benefits was appropriate. *See also supra* note 9 and accompanying text.