**Rajiv BALI, Plaintiff–Appellant,**

v.

**BLUE CROSS AND BLUE SHIELD AS-SOCIATION and Health Care Service Corporation, Defendants–Appellees.**

No. 88–1963.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1988.

Decided May 1, 1989.

Dawn M. Cassie, Hamman & Benn, Chicago, Ill., for plaintiff-appellant.

Andrew R. Running, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, WOOD, Jr., and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

We review a decision of the district court granting summary judgment to defendants, who had refused the plaintiff's request for disability and medical benefits. Because the district court's holding hinged on the plaintiff's repeated failure to comply with reasonable requests for medical documentation, we affirm. However, were the central issue whether benefits were rightly refused based on the medical documentation available, a quite different result might be indicated.

I.

The plaintiff, Rajiv Bali, was employed from January 1980 through March 1982 as an auditor for Health Care Service Corporation ("HCSC"). While an employee of HCSC, Bali was covered by two health

---

**5.** See *United States v. Munsingwear,* 346 U.S. 36, 39.

plans: (1) the Non–Contributory National Long–Term Disability Program (the "LTD Program"), a Blue Cross program administered by the National Employee Benefits and Compensation Committee (the "NEBC")[1] and sponsored by HCSC; and (2) the Health Assurance Plan (the "HA Plan"), administered by HCSC. Both plans are governed by the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1001 *et seq.*

Bali had as a child had his right leg amputated below the knee; before sustaining the back injury that forms the basis of his complaint here, he walked using an artifical limb and crutches. As an auditor for HCSC, the plaintiff was required to perform on-site audits at various Illinois health care facilities. In the performance of an on-site audit, auditors must "make a detailed walking tour of the facility," and must carry manuals and workpapers that "generally weigh from 40 to 60 pounds" to and from the hospital sites. Plaintiff's Exhibit A. Bali's complaint alleges that it was in lifting his auditor's bag that he first injured his back, on July 24, 1981. Complaint at ¶ 10. From the summer of 1981 through March of 1982 Bali remained on leave, and for most of that time received short-term disability benefits. Bali was apparently preparing to return to work in a limited capacity in March of 1982; however, on April 1, 1982, he was dismissed because of unsatisfactory reports on his job performance prior to the time of his disability leave.[2]

In December of 1981, Bali had in the meantime applied for long-term disability benefits. On May 6, 1982, the NEBC Medical Review Committee (the "Committee") reviewed Bali's claim, and granted him benefits for the month of January, 1982. Defendants' Exhibit 9. The Committee determined that Bali's entitlement ended February 1, 1982, when Bali was released to return to work. Bali appealed this decision, requesting reconsideration on the basis of a report from his physician. On June 30, 1982, the NEBC informed Bali that the doctor's report alone would not suffice, and requested further information, including lab reports. Defendants' Exhibit 11. Bali apparently submitted a report from another doctor, Dr. Kolb, but the NEBC denied his appeal on October 14, 1982 because this additional doctor's report did not provide "any objective findings." Plaintiff's Exhibit K.

After receiving a letter from Bali's attorney requesting an additional review of his claim, the NEBC notified Bali that it would again consider his claim if he would provide the requisite medical evidence ("x-ray and lab reports, a medical history of examinations from the date benefits were suspended, current treatment, as well as future plans which will permit Mr. Bali's recovery so that he can return to active employment."). Defendants' Exhibit 15. Bali's attorney forwarded a radiology report and a medical report from Bali's personal physician to the NEBC, Defendants' Exhibit 16,[3] but on February 25, 1983, the NEBC in-

---

1. The NEBC delegated some of its authority for the ongoing administration of the LTD Program to the National Employee Benefits Administration (the "NEBA"). In our discussion we merge the two, treating actions of the NEBA undertaken for the NEBC as simply actions of the NEBC.

2. In a separate lawsuit Bali accused HCSC of national origin discrimination, retaliatory discharge and retaliatory action in the discontinuation of his health benefits. Judge Grady ruled that HCSC had not acted for discriminatory or retaliatory reasons, but rather had "postpon[ed] an unpleasant decision" until it "became necessary for the defendant to make a decision as to whether it wanted the plaintiff to return to work." *Bali v. Health Care Servs. Corp.*, No. 82 C 1931, trans. at 12 (N.D.Ill. Oct. 31, 1986),

reprinted in Defendants' Exhibit 7. The court gave weight to the numerous negative evaluations Bali received in reaching its decision that the termination decision was properly motivated. As to health benefits, the court reviewed the payment procedures involved in the distribution of Bali's short-term disability payments, and concluded that Bali had if anything received extra consideration above and beyond that accorded most employees in his situation. *Id.* at 13.

3. Bali's attorney also forwarded a medical report from Bali's physician analyzing Bali's physical condition with regard to the job requirements listed by the company for a person occupying Bali's auditor position. Defendants' Exhibit 17.

formed the attorney that "all the objective medical evidence requested in our December 20, 1982 letter has not been forwarded to our office." Defendants' Exhibit 18. Bali's attorney then suggested that the NEBC arrange an appointment with a physician of its choice to remedy any gaps in the evidence. Plaintiff's Exhibit L. The NEBC arranged for Bali to see an independent physician, Dr. Rana, at its own expense, and asked that Bali bring to his appointment "X-ray films and reports from radiologists," a "CT Scan of the lumbosacral spine," and "original EMG's and myelogram results." Plaintiff's Exhibit N. The NEBC stressed that "[t]his evidence must accompany Mr. Bali to support the continuation of benefits after February, 1982." *Id.*

In his April 20, 1983 report on Bali, Dr. Rana noted that Bali had brought with him two x-rays of the lumbosacral spine, which showed "very mild narrowing of the L5–S1 disc space" that was "essentially within normal limits." Plaintiff's Exhibit P. Dr. Rana's report concluded:

> Because of the amputation of the right leg, it is very difficult to come up with a definite answer whether he has a herniated disc or not but because of persistent pain in his lower back and sciatica and paresthesia, I think one is obligated to rule out herniated disc and I would advise that he should undergo EMG nerve conduction studies and lumbar myelogram.... I discussed with him his previous job as an auditor which obviously requires a lot of walking and also carrying sometimes 40 to 60 lbs. of weight at a time.... I think a fellow who is on two crutches and has back pain and leg pain, I don't think he can walk long distances or carry weights more than 15 to 20 lbs. at a time.

*Id.* The NEBC subsequently asked that Dr. Rana clarify whether Bali could perform his job if relieved of its "physical requirements." Plaintiff's Exhibit Q. In his reply Rana reiterated his recommendation that Bali undergo tests so as to either rule out or permit treatment of a herniated disc, and added that once that had been accomplished Bali "should be able to handle his work as auditor as you have outlined in your letter, i.e., freeing him from the physical requirements of his job." [4] Plaintiff's Exhibit R.

In June of 1983, the NEBC approved retroactive long-term disability payments for Bali effective from February, 1982 through June, 1983. Plaintiff's Exhibit S. At the same time, the NEBC notified Bali that any further payments would be conditioned on a re-evaluation, and upon his submission to the tests recommended by Dr. Rana:

> The Sub Committee, while granting your appeal for LTD Benefits, expressed concern as to the lack of a specific diagnosis.... They noted that your physicians stated that ... if the pain persists you should undergo a myelogram in order to better determine the cause of your disability so that a program of treatment can begin. Alternatively, your physician may find that a CAT Scan of your lumbosacral spine would be acceptable if combined with an EMG nerve conduction study.
>
> You should be aware that benefit payments are conditioned on the fact that you follow the treatment recommended by your physicians.

Plaintiff's Exhibit T. On October 28, 1983, the NEBC renewed its request for the "objective" medical tests, specifically warning the plaintiff of the importance of compliance: "I must emphasize to you the importance in [sic] furnishing *all* the information requested...." Plaintiff's Exhibit V. Bali once again submitted a report from his personal physician without any of the accompanying data requested by the NEBC. On January 27, 1984, the Medical Review Committee determined that Bali was not

---

**4.** Dr. Rana did, however, express some reservations about Bali's ability to use a prosthesis as anything but a cosmesis. Dr. Rana offered to refer Bali to the Rehabilitation Institute of Chicago for further work on this problem. Plaintiff's Exhibit R. He urged the NEBC to "explain to Mr. Bali that if he wants to get to the bottom of his problem of back and leg pain, then he should undergo the above-mentioned tests." *Id.*

eligible for continuing benefits because he had failed to provide the specific information requested. Plaintiff's Exhibit Y. The NEBC gave Bali 90 days to appeal this decision and to submit the requisite evidence, and subsequently extended its deadline to May 20, 1984.

On June 4, 1984, the NEBC again wrote to Bali, stating that it had not received any of the requested information, and explaining again why the information was necessary:

> The problem we have had with your case and which we have tried many times to explain to you is that we have no objective medical information which is required under the Program as to the cause of pain so severe that a person of your age and attainments cannot do auditor-type work. The objective tests we have, such as x-rays, are within normal limits. Accordingly we have no basis to change the denial decision contained in the January 27, 1984 letter.

Plaintiff's Exhibit HH. On August 2, 1984, Bali at last sent to the NEBC a copy of a report on a myelogram that had been performed in January of 1984. However, he forwarded a radiologist's interpretation of the myelogram, and not the actual test results. On August 31, 1984, the NEBC responded with a final notice requesting Bali's hospital record during the time of his myelogram, a copy of the findings of a CT Scan that had been performed in December of 1983, reports of any surgery and lab tests performed after that time (Bali had had chymopapain treatment in February of 1984, something that certainly would have been pertinent to the Committee's decision had it been informed), physician's notes indicating Bali's course of treatment since December 1983 and Bali's physician's plan for future treatment. Plaintiff's Exhibit JJ. This time the NEBC gave Bali a fixed deadline; the additional data requested must be received by September 14, 1984. The subsequent October 10 decision would be the final step in the claims review procedure.

On September 14, Bali wrote to the NEBC protesting the amount of documentation required, and making a veiled reference to "the confidentiality of the physician patient relationship." Plaintiff's Exhibit KK. He did not provide the requested information. The NEBC, however, made one last effort to obtain support for Bali's claim, and had its consulting physician telephone Bali's personal physician prior to making its decision. It was during this phone conversation that the NEBC apparently first obtained information regarding Bali's chymopapain treatment. There are conflicting reports as to the content of the conversation: the NEBC's consulting physician, Dr. Leigh, claims that he was told that Bali could do a desk job as long as no lifting was involved, while Bali's physician, Dr. Goldflies, claims that he said that Bali was unable to sit for any length of time and that he was totally unable to resume his former job responsibilities. Leigh recommended that Bali be declared ineligible for benefits. His recommendation reported that Bali had a slipped disc that had been treated using chymopapain, and that, according to Bali's doctor, Bali could perform auditor's work as long as physical requirements were removed.

The NEBC Administrative Claims Review Group subsequently denied Bali LTD benefits on October 3, 1984. Its decision was based on the medical evidence then available, and stressed the lack of other confirming evidence or information as a factor in the outcome it reached. Plaintiff's Exhibit MM, Defendants' Exhibit 38. The NEBC decision also relied upon the report of Dr. Leigh, and on Leigh's translation of comments by Dr. Goldflies, for its conclusion that Bali could resume work as an auditor as long as no heavy lifting was required. Finally, the NEBC noted that Bali's former employer had indicated that it would make changes so that Bali would no longer have to perform heavy lifting.

Having exhausted the administrative review process, Bali brought suit in the district court charging violations of ERISA and of state contract law. Judge Aspen granted summary judgment to the defendants, reasoning that because of Bali's failure to provide the evidence requested it was impossible to conclude that the

NEBC's decision was either unsupported by substantial evidence or arbitrary and capricious. *Bali v. Blue Cross and Blue Shield Ass'n*, 683 F.Supp. 1220, 1224 (N.D.Ill.1988). Summary judgment was granted as to the state law claims because they were preempted by ERISA, and plaintiff does not raise the state law claims on appeal.

## II.

■ After the time of the district court's decision in this case, the Supreme Court decided *Firestone Tire and Rubber Co. v. Bruch*, — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), which altered the standard of review in ERISA cases. Thus our first inquiry must be what standard should apply here.

*Firestone Tire* instructs us that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 956.[5] The LTD Program clearly gives the administrator discretion as to the amount and kind of information required to prove disability, as long as the administrator's requests are "reasonable."[6] This discretionary authority is apparent in the Program's definition of "disabled:"

"Disabled" means that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred.

Defendants' Exhibit 1A at 4. While this provision does not give the NEBC complete discretion with respect to the ultimate determination of disability,[7] it does grant discretion as to what sort of evidence may be required from an applicant to provide a basis for the subsequent disability determination. And while the NEBC's discretion does not extend to making "unreasonable" requests, *see supra* note 6, any reasonable requests for documentation are within its discretion under the Program provisions. Thus a *de novo* standard is inappropriate for our review of any reasonable requests the NEBC made for documentation.

■ The NEBC's requests were quite reasonable, as is apparent from the facts recounted above. As early as June of 1982, the NEBC began to ask Bali for "objective" tests to support his disability claim; a myelogram and CT Scan were specifically requested for the first time on March 31, 1983. This request was reiterated in June and October of 1983 and in

---

**5.** Although the existence of a conflict of interest does not alter the applicable standard, the Court also notes that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.'" *Firestone Tire*, 109 S.Ct. at 956. A conflict of interest may arise where the employer is itself the administrator or fiduciary of the plan. *Id.* Bali was an employee of HCSC, while the trustee of the LTD Program is Blue Cross and Blue Shield Association, and the administrators are the NEBC and the NEBA. Thus there was no conflict of interest implicated here.

**6.** The terms of the LTD Program, as provided in a document entitled "Non–Contributory National Long–Term Disability Program," require that each participant "as a condition precedent to the receipt of benefits under the Program, furnish to the Employer such true and correct information as the Committee may *reasonably* request." Defendants' Exhibit 1A at 9 (emphasis added).

**7.** Because we need only address the standard applicable to review of the NEBC's requests for

documentation, we do not reach the defendants' contention that a provision in the contract between HCSC and Blue Cross Blue Shield Association ("Blue Cross") delegates authority to construe the Program to the NEBC. It is true that this contract provides that: "Without limiting the foregoing, the Committee has the power to construe the Program and to determine all questions that may arise thereunder." Defendants' Exhibit 1B at 4. However, this document is not the "benefit plan," and it is to the benefit plan that the Court in *Firestone Tire* refers. 109 S.Ct. at 956. The HCSC–Blue Cross contractual provision delineates the respective duties of the parties to the contract, so that in any disputes between HCSC and Blue Cross the NEBC would have discretion to construe the Program provisions. However, in disputes between Blue Cross and applicants for benefits, the Program document that contains the provisions of the benefit plan governs—and that document gives its own rule of construction for purposes of court review. Defendants' Exhibit 1A at 11 ¶ 18.

June of 1984. Yet it was not until August of 1984 that Bali sent the NEBC a myelogram report, and even then he did not submit the actual test results but just a radiologist's interpretation of those results. It is difficult to understand why Bali, while energetically pursuing his requests for original and then continuing benefits, failed to provide the documentation requested when he had had it in hand since January of 1984. Still more mysterious is his complete failure to apprise the NEBC of the CT Scan he had performed in December of 1983, or of the chymopapain treatment he underwent in February of 1984. The NEBC was entitled under the terms of the Program to be informed of these developments. The Program's terms specify that provision of reasonably requested information is a condition precedent to the receipt of benefits, and permit the NEBC to require examinations and evidence at any point to demonstrate disability.[8] Because Bali consistently refused to give the NEBC the "objective" test results it had the discretion to seek, the NEBC did not act arbitrarily or capriciously in denying benefits on the data it had before it.

The district court's decision further suggests that were we to conduct a substantive review of the evidence before the NEBC, we would conclude that benefits were correctly denied. This is a far more problematic proposition, for on the conflicting subjective evidence the NEBC had before it, it would be very hard to conclude—especially on a summary judgment motion—that the decision should survive even review under the "arbitrary and capricious" standard, let alone the *de novo* review now indicated under *Firestone Tire*.

The NEBC relied first on its consulting physician, whose comments depended entirely on a reported phone conversation with Bali's treating physician. Bali's treating physician flatly contradicts the conclusions drawn by the NEBC's consulting physician. In any contest between these two versions, it would be difficult to credit the NEBC's consulting physician, for he had no data other than Dr. Goldflies' comments to support his recommendation. Apart from that, the NEBC had before it a myelogram report that indicated a slipped disc—hardly a clean bill of health for Bali. Although Bali unreasonably withheld other data, those data as they have come to light strongly support his contention that he is disabled. Finally, the NEBC's conclusion that Bali could return to his job was entirely dependent on comments by HCSC indicating that it might be able to relieve Bali of some of the physical requirements of his work. By the time of this determination, the HCSC was no longer willing to employ Bali, and the only evidence the NEBC had before it indicated that the physical requirements of which Bali had to be relieved were a standard part of his job. Thus its decision that Bali could return to work when that work generally required lifting, and when the NEBC itself recognized that Bali could no longer do that lifting, could well be incorrect on the merits.

### III.

However, we do not here reach the merits of Bali's claim, because Bali repeatedly failed to provide the NEBC with the information it reasonably requested. And without that objective evidence before it, the NEBC acted within its discretion in refusing Bali's claim.

AFFIRMED.

---

**8.** The Program provides that

A Participant shall be entitled to benefits under this Program if he is found, on the basis of medical evidence satisfactory to the Committee, to be Disabled.... A Disabled Participant also may be required by the Medical Committee to submit to a medical examination at any time, whether prior to or subsequent to the required medical examination on the second anniversary of the date he became Disabled, to determine whether he has ceased to be disabled.

Defendants' Exhibit 1A at 5.