Lawrence CHANDLER, Plaintiff,

v.

UNDERWRITERS LABORATORIES,
INC., Defendant.

No. 93 C 4566.

United States District Court,
N.D. Illinois,
Eastern Division.

May 5, 1994.

Robert J. Leoni of Brunswick, Keefe &
Deer, Blue Island, IL, for plaintiff.

Barry A. Hartstein, Jenner & Block, Chicago, IL, for defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Lawrence Chandler ("Chandler") has filed this action under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461,[1] against his former employer Underwriters Laboratories, Inc. ("UL"). Chandler charges that UL:

1. improperly denied him Long Term disability benefits under its Salary Continuation Plan ("Plan") in violation of Section 1132(a)(1)(B), and

2. retaliatorily discharged him after he asserted a claim for benefits under the Plan in violation of Section 1140.

UL has responded that Chandler was correctly denied benefits and properly discharged, and it relatedly asserts that it is entitled to a partial rebate of amounts previously paid to Chandler under the Plan.

UL has now moved for summary judgment on all of those issues under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, UL's motion and counterclaim are granted in their entirety and this action is dismissed with prejudice.

*Facts* [3]

*Background of Chandler's Employment and Medical History*

Chandler began his employment with UL on February 3, 1958 (D. 12(M) ¶ 7). Beginning in March 1983 he was assigned to work as a Senior Field Representative out of UL's Park Forest[4] Inspection Center (D. 12(M) ¶ 8), visiting companies to inspect products enjoying the UL mark of approval. That required a significant amount of driving to and from such companies (19,306 miles in 1990), and then walking to conduct the necessary inspections once at the companies (D. 12(M) ¶ 10).

Chandler had a long history of medical problems during his career at UL. For present purposes the account may begin with two injuries suffered during inspections, one when he injured his lower back on November 30, 1990 and the other when he fell in a parking lot on January 11, 1991 (D. 12(M) ¶¶ 12(i), 12(k). Just a day before that last injury Chandler had sent a letter to Gary Hansen ("Hansen"), the Associate Managing Engineer in UL's Follow–Up Services Department at Northbrook, describing his need for a third hernia operation and his continuing problems with and therapies for his back (*id.* ¶ 12 (j)).

Some time before February 5, 1991 the then Managing Engineer of UL's Follow–Up Services Department at its Northbrook office Richard Clinard ("Clinard") met with Hansen and another Associate Managing Engineer also at Northbrook, Tim Russell ("Russell"), to discuss Chandler's transfer to a "desk job" at the Northbrook offices (Clinard Dep. 38–39). They agreed on that transfer and then met with Chandler to tell him about it. At his deposition Chandler testified to his understanding that if "my problems cleared up" he would be returned to his old job as a Senior Field Representative (P. 12(N)(1)

---

**1.** Further citations to ERISA's provisions will simply take the form "Section —," referring to the Title 29 numbering and not to ERISA's internal numbering.

**2.** Familiar Rule 56 principles impose on movant UL the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Chandler (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

**3.** This District Court has instituted its own General Rule ("GR") 12 to facilitate the resolution of Rule 56 motions:

1. GR 12(M) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts.

2. GR 12(N) requires the nonmovant to respond point by point, with citations to the record in support of (a) any claimed contest of the movant's version of the facts and (b) any additional facts that the nonmovant chooses to assert.

Both parties have filed such submissions. UL's GR 12(M) statement will be referred to as "D. 12(M) ¶—." Because Chandler admits virtually all of the assertions in D. 12(M), there is little need to refer to Chandler's GR 12(N) statements—instead only D. 12(M) will be cited for those admitted facts. Where reference to Chandler's papers is called for, his GR 12(N) response will be cited "P. 12(N)."

**4.** All locations are in Illinois.

¶ 11; Chandler Dep. 155–57).[5] On February 5, 1991 he transferred to Northbrook as an Engineering Assistant (Clinard Dep. 40–41), a desk job that had no counterpart in the Park Forest office or in UL's Elmhurst inspection center (D. 12(M) ¶ 14).

After Chandler's transfer his medical problems continued. On February 8, 1991 he had another car accident resulting in a trip to a hospital, and from February 12 to April 1, 1991 he was absent from work due to his third hernia operation and back problems (D. 12(M) ¶¶ 15–16). When Chandler returned to work on April 1 he was expected "to work full scheduled time" (Doc. D00011[6]). But UL's April 17, 1991 "Return to Work Recommendation" limited Chandler's work day to 6 hours (D.Ex. 5P at DD0261), apparently in response to a recommendation by orthopedic surgeon Dr. Richard Beaty that Chandler "May do old job limit driving & Hrs. to 8½ hrs/day" (D. 12(M) ¶ 17; D.Ex. 5P at DD0262). That 6–hour limitation was imposed because Chandler had a 96–mile round trip commute from his Tinley Park home to his Northbrook job (D. 12(M) ¶ 18). UL also assigned him a parking spot closer to his office building to minimize his walking (D. 12(M) ¶ 17). Chandler continued working a reduced work day until August 7, 1991, when he went on paid disability leave until October 7, 1991 for prostate surgery (D. 12(M) ¶ 19). After Chandler returned to work on a full-time basis on October 7, he left work again on October 22, 1991 for surgery on a herniated disc in his neck. That surgery was performed on October 30 by Dr. Danilo B. Soriano (D. 12(M) ¶¶ 24).

*Denial of Disability Benefits*

On November 8, 1991 UL's Assistant to the Treasurer Robert Scott ("Scott")—who manages Corporate Employee Benefits, the department that "facilitates claims under UL's" Plan—informed Chandler that "[d]ue to the complex nature of your disability" his claim had been referred to Parkside Health Management Corporation ("Parkside").[7] Scott asked Chandler to provide Parkside "with any information they might need regarding your disability" (D. 12(M) ¶ 27).

Parkside recommended paid short-term disability leave through February 27 and later through June 26, 1992, recommendations that UL accepted and implemented (D. 12(M) ¶¶ 31, 32, 38). On July 13, 1992 Parkside's Physician Advisor Dr. George Beranek reviewed its information about Chandler and concluded that he had been "cleared by his attending physicians to return to work with certain restrictions" (Kreie Aff. ¶ 16; D. 12(M) ¶ 44). Next day Parkside sent a Notice of Program Compliance ("Notice") to Scott to that effect, "[r]ecommend[ing] non-authorization beyond 6/26/92" (D.Ex. 25; D. 12(M) ¶ 45).

Based on that recommendation and on a review of Chandler's medical information maintained in Scott's department, Scott concluded that Chandler was no longer eligible for benefits under the Plan because (D. 12(M) ¶ 46; Scott Aff. ¶ 17):

> It appeared that Chandler's primary limitation was his inability to make a lengthy commute and this limitation did not appear to be a covered "disability" based on the terms of the Salary Continuation Plan.

On July 27, 1992 UL's Human Resources Manager Cindy Ryder ("Ryder") sent Chandler a letter saying that he would be expected to return to his job as an Engineering

---

**5.** Chandler now urges that his medical problems were not the reason for his transfer—that it was part of a long-range plot to get rid of him. From this Court's independent review, the record negates any such inference. In addition, Chandler's attempted reliance on his affidavit (P. 12(N)(1) ¶ 11; Chandler Aff. ¶ 2) to show that he objected to the transfer is really a red herring, for it would not affect the outcome here in any event. But if it *were* relevant, Chandler would face the problem that as an affidavit assertion at odds with his earlier deposition testimony (which expressed no such objection, Dep. 155), it would not be entitled to credence on the current motion

(see *Darnell v. Target Stores*, 16 F.3d 174, 176–77 (7th Cir.1994)).

**6.** That exhibit, referred to by its Bates stamp number, is attached to Chandler's GR 12(N)(1) and (2) statements.

**7.** UL periodically used Parkside to make recommendations regarding eligibility for disability benefits under the Plan (D. 12(M) ¶ 28; Scott Aff. ¶ 6). In the summer of 1992 Parkside changed its name to Health Direct (D. 12(M) ¶ 44; Kreie Aff. ¶ 16), but for the sake of simplicity only the former name will be used.

Assistant on August 3 (D. 12(M) ¶ 47). As of August 3 the benefits that Chandler had been receiving under the Plan since October 22, 1991—basically a continuation of his full salary and major medical insurance—were discontinued (D. 12(M) ¶ 50).

*Chandler's Appeal of Denial of Benefits*

When Chandler did not report for work on August 3 (D. 12(M) ¶ 48), Ryder again wrote Chandler on August 4 (D. 12(M) ¶ 49; D.Ex. 28) stating that (1) his claim for benefits under the Plan had been denied based on Parkside's conclusion that he had been able to return to work since June 26, 1992, (2) she was enclosing "a page" from the Plan explaining his right to appeal that decision,[8] (3) his payroll check had been cancelled because he had not returned to work as requested and (4) "[c]ontinued failure to return to work may lead to further action up to and including termination." When Chandler still did not report for work, Ryder sent yet another letter on September 2 reiterating parts of her earlier letter and telling Chandler (1) that he had 65 days after the denial of his claim to "file a written request for a review of the claim denial" and (2) that retroactively to August 3 he had been put on an "unpaid Leave of Absence (LOA)" to continue for the 65–day appeal period (D. 12(M) ¶ 51; D.Ex. 29 at DD0347). Chandler appealed the discontinuation of his benefits through a September 29, 1992 letter from his attorney (D. 12(M) ¶ 52).

Under the Plan a Committee on Claims ("Appeals Committee") comprising three UL Vice Presidents (Treasurer Lawrence Newman ("Newman"), General Counsel Debra Rade ("Rade") and Secretary Ken Melnick ("Melnick")) had been appointed to hear appeals challenging the denial of benefits (D. 12(M) ¶ 54). Scott prepared a memorandum for Newman (D. 12(M) ¶ 56; D.Ex. 34) that summarized and attached Parkside's April 3, 1992 Notice that had recommended the authorization of benefits through June 27, 1992, Parkside's July 14, 1992 Notice, Ryder's three letters to Chandler and four doctors' letters from the June–July 1992 period—one each from Dr. Ronald Mochizuki, Dr. Beaty,

rheumatologist Dr. Richard Gainey and Dr. Robert Eilers of Physical Medicine and Rehabilitation Associates. Scott also enclosed some items submitted by Chandler's lawyer: the same note from Dr. Eilers, an earlier letter from Dr. Gainey, a "Neuropsychological Evaluation" conducted on September 23 and 28 and October 7, 1992 by Clinical Psychologist Denise Gehrling, Ph.D. and this brief August 12, 1992 letter from Professor of Urology Dr. Ilija Sreckovic:

> I had the opportunity to see you on the day of August 12, 1992 as well as July 14, 1992. I would like to stress that your overall condition and illness lead me .to give you 100% disability for any work.
>
> Please seek for disability immediately.

Scott's forwarding memorandum said that the additional evidence submitted by Chandler had been sent to Parkside for evaluation and that Parkside had reaffirmed its recommendation that Chandler was not eligible for benefits beyond June 26, 1992 (D.Ex. 34 at DD0411; D.Exs. 35, 36). In his later-prepared affidavit Scott states that he did not include Chandler's complete and extensive medical history because Chandler had been on approved disability leave until June 26, 1992 and the sole issue for purposes of Chandler's appeal was his "most recent medical status" (D. 12(M) ¶ 56; Scott Aff. ¶ 24). Newman sent copies of Scott's memorandum and its attachments to Rade and Melnick.

On November 19, 1992 the Appeals Committee met and discussed the case for a half hour, concluded that Chandler could perform his prior job and hence denied his appeal (D. 12(M) ¶¶ 58, 58d, 58e). It was the Appeals Committee's understanding that Chandler was still able to perform his desk job at Northbrook (D. 12(M) ¶¶ 58c, 58c(4), 58e). They found that Chandler's "primary limitation" was an inability to tolerate a lengthy commute, which they determined was not a disability within the meaning of the Plan, but rather a "limitation within the control of the employee" (D. 12(M) ¶ 58e). For that purpose they relied on the medical evidence: the letters from Drs. Mochizuki, Beaty, Gainey

8. In fact pages 10 and 11 were enclosed (D.Ex. 28 at DD0343–DD0344). Relevant portions of

the Plan, which is included in the record as D.Ex. 1, will be quoted below.

(his later letter) and Eilers, plus Parkside's recommendation that benefits not be authorized past June 26, 1992.

It was clear that the Appeals Committee had also considered the materials emanating from Chandler's counsel. It did not credit Dr. Sreckovic's conclusion that Chandler was "100%" disabled because it was inconsistent with all of the other medical evidence (D. 12(M) ¶ 58(e)). As for Dr. Gehrling's evaluation, the Appeals Committee decided not to consider it as part of the claim before it—the neuropsychological claim had not gone through UL's regular claims process, and the Appeals Committee was after all an appellate body.

On November 23, 1992 Newman wrote Chandler that the appeals Committee had "unanimously denied" his appeal because (D. 12(M) ¶ 59, D.Ex. 37 at DD0441):

> In particular, information we reviewed indicated that you are capable of performing the duties of your present job. An individual who is capable of performing the duties of his present job, irrespective of whether or not he is capable of tolerating a lengthy commuting distance, does not present a condition which constituted a disability under the Plan.

But to dispel any notion that it had turned down the newly-proffered material (Dr. Gehrling's evaluation) on the merits, Newman went on to say that the denial related only to Chandler's "original disability claim" and that Dr. Gehrling's evaluation would be treated as a "new psychological claim" that would be "handled through our disability review process" to determine if it constituted a disability under the Plan (id. at DD0441).

### Denial of Chandler's Psychological Claim

UL continued Chandler's LOA status while it awaited a determination on his neuropsychological claim (D. 12(M) ¶ 61). In response to a February 2, 1993 fax inquiry from UL (D.Ex. 38 at DD0444), Parkside stated that it recommended denying Chandler's second claim based only on Dr. Gehrling's "Neuropsychological Evaluation" (it had received no

other information or correspondence about that claim from Chandler or his representative) (D. 12(M) ¶ 62; D.Ex. 38 at DD0445; Scott Aff. ¶ 27). On February 5 Ryder wrote Chandler that his second claim was denied because (D. 12(M) ¶ 63; D.Ex. 40 at DD0452):

> 1. Dr. Gehrling's evaluation did not support a claim of disability.
>
> 2. In any event the claim was not timely filed under the Plan, for it arose in part from a February 8, 1991 car crash but the claim was not filed until October 1992.
>
> 3. Chandler's return to work after the car crash in April 1991 and his then performing his work for four months in an adequate manner "substantiat[ed] your ability to perform the duties of your job."

Ryder's letter went on to say (id.):

> Enclosed is a copy of the page from the Summary Plan Description for the Salary Continuation Plan explaining your rights to appeal this decision. If you choose to file such a request, you should send it to the UL Committee.

Neither Chandler nor his attorney ever filed such an appeal (D. 12(M) ¶ 65).

### Chandler's Termination

On February 5 and March 26, 1993 Ryder wrote letters telling Chandler that he had until April 1, 1993 to return to his job and that his failure to do so would mean he had "voluntarily resigned your employment" (D. 12(M) ¶¶ 66–67, D.Ex. 40 at DD0453–DD0454, D.Ex. 44).[9] Chandler did not return to work on April 1, and his resignation was processed by UL effective that day (D. 12(M) ¶ 74). On April 2 Ryder wrote Chandler that his "resignation has been processed" (D. 12(M) ¶ 75; D.Ex. 45A).

### Chandler's Social Security Claim

Chandler had applied for Social Security disability benefits some time after October 22, 1991, when he went on paid short-term disability leave from UL (D. 12(M) ¶ 80; Chandler Dep. 83–84). Although his application was originally denied, he requested a

---

9. At that time the only desk jobs that UL had within the Chicago area were at its Northbrook office. Its Elmhurst office "potential[ly]" had job openings but employed only Field Representatives (D. 12(M) ¶ 69; UL's Corporate Human Resources Manager Howard Simon Aff. ¶ 9).

hearing before an Administrative Law Judge ("ALJ"). On July 12, 1993 the ALJ rendered a decision granting Chandler Social Security disability benefits retroactively to February 8, 1991. UL states, and Chandler admits, that the ALJ's decision took into account significant additional medical evidence, stemming from Drs. Gehrling and Eilers and neurologist Dr. Victor Berger, that was never presented to UL or Parkside (D. 12(M) ¶ 88). For the period from February 1991 through July 1993 Chandler received in back benefits approximately $22,000, out of which he paid $4,000 for attorney's fees (D. 12(M) ¶¶ 89–90).

*UL's Plan*

Naturally the terms of the Plan itself are crucial to evaluating UL's summary judgment motion. Chandler had a copy of the current version of the Plan (D. 12(M) ¶ 22; Chandler Dep. 26–27), which contained the sole description of the Plan terms (Newman Aff. ¶ 13). Only a few of the Plan's provisions (the Plan is reproduced in full as D.Ex. 1) are sufficiently relevant to require quotation (boldface type in original):

### IMPORTANT TERMS

\*      \*      \*      \*      \*      \*

**DISABILITY**—A condition caused by illness or injury so severe at the time that you are, for a period of time, totally and continuously unable to perform the necessary duties of your present job or any available job for which you are or could be reasonably fitted by training, education or experience.

\*      \*      \*      \*      \*      \*

### ELIGIBILITY FOR BENEFITS

You are eligible to receive Short Term Disability benefits when all of the conditions listed below are met:

\*      \*      \*      \*      \*      \*

(e) your Physician provides evidence satisfactory to UL that you meet the conditions of Disability as defined on page 3. (Note—You are responsible for

assuring that the evidence is sent by the Physician)....

\*      \*      \*      \*      \*      \*

You are eligible to receive Long Term Disability benefits when all of the following conditions are met:

\*      \*      \*      \*      \*      \*

(e) you arrange with your Physician to provide UL with satisfactory evidence of your continued Disability and other medical information deemed pertinent by UL. (Note—You are responsible for assuring that the evidence is sent by the Physician.)

\*      \*      \*      \*      \*      \*

### BENEFIT OFFSETS

Disability benefits are calculated using your Base Salary at the start of Disability and are normally paid semi-monthly. Benefits are reduced (offset) by any payments received by you as a result of Disability occurring during UL employment. Payments may be from any of the following sources:

—primary and family Social Security *Disability* payments.

\*      \*      \*      \*      \*      \*

### TO FILE A CLAIM

\*      \*      \*      \*      \*      \*

The receipt by UL of the appropriately completed claim forms will constitute the filing of a claim. **You are responsible for assuring your Physician files the medical information with UL.**

\*      \*      \*      \*      \*      \*

If any claim for Plan benefits is denied after completion of the established claim procedure, you shall be given written notice of the denial....

In the event of disagreement as to the reasons for denial of the claim, you or your authorized representative may request a review of the UL Committee of the claim denial by filing a written request for review with the UL Committee within 65 days after the date of the claim denial.

### Review of UL's Decision

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) teaches:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Just six weeks ago our Court of Appeals confirmed that the "deferential standard of review" applicable to such discretionary decisions (*id.* at 111, 109 S.Ct. at 954) applies to the fiduciary's plan interpretations as well as factual determinations (*Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 n. 2 (7th Cir.1994), affirming this Court's grant of summary judgment, 822 F.Supp. 535 (N.D.Ill.1993)). And where a plan's terms vest the fiduciary with general (essentially unrestrained) discretion, its actions are entitled to "the highest level of deference"—they will be overturned only if arbitrary and capricious (*Exbom v. Central States, Southeast & Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir.1990)).

■ There is no question here that the Plan grants the type of discretionary authority that triggers that generous standard, for it is "unnecessary" that a plan use "magic words (such as 'the committee has discretion to …')" (*Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1371 (7th Cir. 1990)). *Donato*, 19 F.3d at 379 has reconfirmed that a provision making receipt by the administrator of evidence "satisfactory" to it as a precondition of eligibility for benefits furnishes "sufficient discretion to apply the arbitrary and capricious standard"; accord, *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir.1989).

That requirement of providing UL with evidence "satisfactory" to it is precisely what the Plan demanded of Chandler. And for UL to fall afoul of the resulting highly defer-

ential standard of review, its decision must be "not just clearly incorrect but downright unreasonable" (*Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990)) or, as more colorfully expressed in *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762, 766 (7th Cir.1993), quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985):

> Although it is an overstatement to say that a decision is not arbitrary or capricious whenever a court can review the reasons stated without a loud guffaw, it is not much of an overstatement.

After Chandler's Mem. 1 has acknowledged the applicability of the "arbitrary and capricious" standard,[10] he challenges UL's decisions in three respects:

1. It treated Chandler's neuropsychological problems as a separate claim.

2. It assertedly assessed the available evidence incorrectly.

3. It concluded that his inability to commute lengthy ·distances was not a disability under the Plan.

Those contentions will be addressed in turn.

### Dr. Gehrling's Report

■ It must be remembered that the Appeals Committee is just that. Its place in the Plan's structure is to *review* claim denials, not to consider claims in the first instance. And so it can scarcely be labeled arbitrary or capricious for it to have told Chandler' that it would review his appeal based on the evidence that had been taken into account when his claim was denied and—in order that he not lose out by reason of that treatment—that the neuropsychological matters would be handled under the regular claims procedure, as to which he "may be entitled to benefits under the Plan" (D. 12(M) ¶ 60; D.Ex. 37 at DD0441). Chandler cannot fairly complain about that treatment, which implicated no views whatever on the merits of the newly-tendered evidence.

At that point Chandler elected not to submit any additional medical documentation in

---

**10.** Chandler Mem. 1–2 goes on to urge that UL acted in bad faith. But those are of course not separate tests—bad faith is simply subsumed in the question whether a decision was arbitrary and capricious (*Allison v. Dugan*, 951 F.2d 828, 833 (7th Cir.1992)).

support of the claim (which the Appeals Committee had essentially remanded for his benefit). And when UL then denied that claim on February 5, 1993 based on Parkside's recommendation, Chandler was once again notified of his right to appeal that turndown to the Appeals Committee (D. 12(M) ¶¶ 62–63)—but no appeal was ever filed (*id.* ¶ 65).

Once again this Court need not treat with the merits of Dr. Gehrling's analysis as the predicate for a claim of disability under the Plan. Where Chandler has thus failed to exhaust the remedies available to him under the Plan, it is well within this Court's sound discretion to reject review on that ground alone (see, e.g., *Powell v. A.T. & T. Communications, Inc.*, 938 F.2d 823, 825–26 (7th Cir.1991)). And that rule applies with full vigor to the situation where (as here) a claimant fails to avail himself of the right under a plan to appeal an initial denial of benefits (*Smith v. Blue Cross & Blue Shield United*, 959 F.2d 655, 658 n. 2 (7th Cir.1992)).

If Chandler were allowed to come before this Court and claim injury when he has failed to take advantage of the remedies available to him (and of which he was given explicit notice) under the Plan, that would subvert the requirement of Section 1133(2) that all qualified plans allow for internal "review" of any "decision denying [a] claim" and would be contrary to the numerous reasons that Congress had for vesting "primary responsibility for claim processing" with plan trustees (*Powell*, 938 F.2d at 826; accord, *Kross v. Western Elec. Co.*, 701 F.2d 1238, 1244–45 (7th Cir.1983)). Consequently Chandler's failure to pursue and exhaust the Plan's administrative remedies precludes review of his neuropsychological claim here.

### Chandler's Original Claim

Chandler asserts that UL incorrectly found him not disabled both because it ignored certain medical evidence and because it evaluated what was before it improperly. Both contentions must be evaluated under the arbitrary and capricious standard—and

viewed through that lens, both contentions fail.

### 1. Medical Evidence Considered

■ When the Appeals Committee reviewed UL's denial of Chandler's original claim, it had before it only the seven most recent medical reports about Chandler. Because the Plan requires "evidence [of disability] satisfactory to UL," and because disregarding evidence is functionally equivalent to finding it not "satisfactory," the discretion that UL enjoys in making a factual finding of disability includes the discretion to decide which items of evidence tendered to it are and are not relevant.

It is of course a truism to say that the condition of an individual can change over time for the better or for the worse. That a person was once found disabled does not mean he or she will always be so, just as the absence of such a finding cannot foreclose a conclusion of disability at some point in the future. All four reports that Scott sent to the Appeals Committee had dates ranging from June 23 to August 12, 1992. UL had granted Chandler paid disability leave through June 26, 1992, so the specific issue that he was appealing was UL's finding that he was no longer disabled after that date. It cannot be said that it was arbitrary and capricious to consider that the only medical reports indicative of a continuing disability would be those produced shortly before as well as shortly after that date.

■ That dispatches Chandler's assertion that UL and then the Appeals Committee were arbitrary and capricious in failing to consider the earlier as well as the current opinions from Drs. Beaty and Mochizuki. And as for Chandler's generalized and unsupported contention that the Appeals Committee failed to request medical evidence from Parkside that UL knew supported his original claim, that argument both exhibits a lack of understanding of basic Rule 56 principles[11] and improperly attempts to shift Chandler's own burden of supplying evidence

---

11. Where a summary judgment movant has carried its initial burden, the nonmovant—here Chandler—cannot rely on pure supposition, but must rather come forward with specific evidence

to support the reasonable inference that a genuine issue exists requiring trial (*Young In Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993)).

of his disability onto UL (as stated in the earlier-quoted excerpt from the Plan's "TO FILE A CLAIM" provisions, emphasis in original):

> A representative of the Human Resources Department will ... assist you in obtaining from you Physician(s) the medical information which is needed to make a determination as to **Disability**.... **You are responsible for assuring your Physician files the medical information with UL.**

In the latter respect, it is unnecessary to rely on any notion of constructive notice, based on Chandler's having had a copy of the Plan before he made his original claim. It will be recalled that his attorney did in fact submit four medical documents to UL. To the extent that Chandler may have believed that other evidence was relevant to his claim, the burden of submission was his and not UL's. And that principle is echoed in the case law (*Donato*, 19 F.3d at 380 (plan trustee is "bound only to consider what evidence and information it had before it"); *Bali*, 873 F.2d at 1048 (where claimant fails to submit evidence, the court reviews denial of benefits based only on the evidence before the review committee)).

In sum, UL's and the Appeals Committee's selection of the evidence for consideration by the Appeals Committee cannot be labeled as arbitrary or capricious. It must stand.

### 2. Assessment of the Medical Evidence

■ Based on the medical evidence, the Appeals Committee concluded that Chandler was not medically disabled and that the only thing preventing him from returning to his desk job was his inability to tolerate his lengthy commute (which the Appeals Committee concluded was not a disability within the meaning of the Plan). Once again this Court's standard of review is whether those determinations were arbitrary and capricious. And to state the question in those terms is assuredly to reject Chandler's position.

First, the determination that Chandler was medically capable of returning to his desk job and that the only thing preventing him from doing so was his inability to drive long distances is certainly not "implausible" in light of the evidence—the test of whether it is arbitrary and capricious (*Allison*, 951 F.2d at 833–34). Weighing the evidence and relying on findings of doctors (Chandler's own physicians, Drs. Beaty and Mochizuki [12]) to that effect is for the Appeals Committee and not for this Court. This Court's role is not to "reweigh the evidence" or to determine its most logical import, but simply to ascertain whether the evidence is "sufficient to support the ... decision" (*Exbom*, 900 F.2d at 1144). It plainly is.

Before this opinion departs from the subject of medical evidence, this Court should deal at least briefly with each of three other matters raised (or at least suggested) by Chandler in that respect:

> (a) UL's failure to credit the SSA's determination that Chandler was disabled;

> (b) the propriety of UL's relying on Parkside's recommendation; and

> (c) perhaps most basically, UL's rejection of Chandler's driving limitation as a "disability" for Plan purposes.

As the ensuing discussion reflects, none of those matters alters the already-signaled outcome.

#### (a) Social Security Determination

Chandler Mem. 9–10 asserts that SSA's later determination that he was disabled as of February 8, 1991 "does have some probative value" and that it "demonstrates a standard of care that should be exercised in the review of such matters." If those characterizations are intended to frame a question, it is the wrong one—the issue is not whether that SSA determination was right, but rather whether it marks as arbitrary and capricious UL's decision that Chandler was not disabled as of June 26, 1992.

In part UL responds that the SSA determination cannot be accorded any weight here

---

**12.** This opinion's specific reference to those two physicians should not be misunderstood. It was also within the Appeals Committee's ken to review and evaluate the other doctors' opinions as supporting the same conclusion (and to discount Dr. Sreckovic's letter as inconsistent with all the other opinions).

because the ALJ relied on medical evidence never submitted to UL. Chandler disagrees, contending that the medical opinions of "Drs. Konis and Sreckovic" to which the ALJ gave "great weight" and that the ALJ found to establish a *"prima facie* case of disability" (D.Ex. 48 at DD0521) are in fact the opinions from Drs. Mochizuki[13] and Sreckovic that were before the Appeals Committee. Because the opinions referred to in the ALJ's determination are not included in the record, there is no way to determine which side has it right.

But there is no need to decide that. After all, it is entirely possible for different factfinders to view even identical evidence in different ways and for neither of them to be vulnerable to attack as arbitrary and capricious. Just as an ALJ's decision must be upheld on judicial review if it meets the undemanding test of being "supported by substantial evidence" (42 U.S.C. § 405(g)), which "may be something less than the greater weight or preponderance of the evidence" (*Young v. Secretary of HHS,* 957 F.2d 386, 389 (7th Cir.1992)), so the opposite decision by ERISA fiduciaries vested with discretion must be upheld on judicial review unless it is "downright unreasonable" (as the case law has said of the arbitrary and capricious standard). And that latter question must clearly be answered in the negative, as this opinion has already shown.

### (b) *Parkside's Recommendation*

Any claim that the Appeals Committee was arbitrary and capricious is further negated by its reliance on the conclusion by its independent medical consultant Parkside that Chandler was no longer disabled. In that respect Chandler attempts to attack Parkside as laboring under an alleged conflict of interest and to attack the Appeals Committee's reliance on Parkside because it had no knowledge that Parkside had a physician review the medical records before making its recommendation. Both of those attacks fail.

As to the first, Parkside's internal notes, which Chandler argues show it to be a "hired

gun," do not fairly support a conflict-of-interest characterization. Such an argument proves too much, for it might *always* be thought to be in the interest of a plan administrator or its consultants to deny benefit applications. Though to be sure such a "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion'" (*Bruch,* 489 U.S. at 115, 109 S.Ct. at 956, citing Restatement (Second) of Trusts § 187, Comment *d* (1959)), that factor simply enters into the evaluation of the decision in arbitrary and capricious terms—as *Donato,* 19 F.3d at 380 n. 3 put it:

> This is a variation on a theme we noted in *Van Boxel* [*v. Journal Co. Employees Pension Trust* ], 836 F.2d [1048,] 1052 [ (7th Cir.1987.) ]—that the arbitrary and capricious standard of review is a sliding scale standard that should be "more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is."

Here the Appeals Committee readily passes that test both with and without the input from Parkside.

As for Chandler's second argument (that UL has not offered evidence that the Appeals Committee knew Parkside had a physician review the available medical evidence before making its recommendation), Chandler is wrong on two fronts. For one thing, he again mistakes his Rule 56 responsibility to come forward with evidence to support his assertion, something that he does not do. UL has no obligation to negate a genuine factual issue until Chandler offers evidence that one exists (see *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) and *Young In Hong,* 993 F.2d at 1261). And if that were not enough (though it is), even a passing look at the record shows Chandler to be factually wrong as well. Parkside's April 3, 1992 Notice, forwarded by Scott to the Appeals Committee, states (D.Ex. 34 at DD0412):

> The physician advisor has reviewed the results of the I[ndependent] M[edical]

---

13. Chandler says that the ALJ mistakenly referred to Dr. Mochizuki as Dr. Konis because they use the same letterhead.

E[xamination]. The physician advisor feels the employee is not permanently disabled at this time as he is only four months post operative.

That obviously refers to Parkside's physician who reviewed Chandler's medical evidence (whom the record elsewhere discloses to be its Medical Director, Dr. Walter Hollinger (D. 12(M) ¶ 36; D.Ex. 17)).

### (c) *Standard of "Disability"*

That leaves for discussion only the Appeals Committee's view of the Plan's "disability" standard (perhaps a question with which the analysis may have begun). On that score the Appeals Committee found (D. 12(M) ¶ 58e):

Chandler's primary limitation, which was his limitation in not being able to commute a lengthy distance, was not a "disability" under the Salary Continuation Plan. The Committee reviewed the definition of "disability," as defined in the Salary Continuation Plan [quoting the definition]. Chandler worked in a "desk job" in Northbrook, and it was the Committee's view that an employee's limitation in not being able to commute a lengthy distance to work was a limitation within the control of the employee.

And it will be recalled that the Plan's definition of disability is:

A condition caused by illness or injury so severe at the time that you are, for a period of time, totally and continuously unable to perform the necessary duties of your present job or any available job for which you are or could be reasonably fitted by training, education or experience.

It is surely neither arbitrary nor capricious for the Committee to have decided that Chandler was "able to perform the necessary duties of" his desk job and that it was not required to view his inability to get to that job from his home in Tinley Park as a disabling "condition." Even under Chandler's different (and counterintuitive) notion, if he had lived within a substantially shorter commuting distance (to say nothing of within walking distance) from the Northbrook office, he could not have claimed that his driving limitation rendered him disabled. It is absurd to suggest that it is arbitrary and capricious for the Appeals Committee to have decided that the fortuity of where an employee lives (something within the employee's control, unlike a truly medical disability) is not relevant to a finding of disability under the Plan—a concept that expressly focuses on medically disabling conditions.[14]

### *Chandler's Section 1140 Claim* [15]

■ To prevent ERISA rights from becoming a dead letter, Section 1140 states in relevant part:

It shall be unlawful for any person to discharge ... or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

Under that provision Chandler must show that UL transferred him (*Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir.1991), quoting *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir.1990)):

because of a specific intent to interfere with ERISA rights ...; no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination.

In an effort to meet that burden, Chandler Mem. 2 asserts that UL's actions were "part of [an] over all plan to eliminate Larry Chandler from the work force." As evidence Chandler, *id.* points out that Newman testified (P. 12(N), Newman Dep. 23):

Q. Now, let me ask you, in your understanding of the definition of disability, as you have interpreted it in the November 23rd letter of 1992, if Mr. Chandler was in the position of field representative where

---

14. If Chandler had instead lived close to Northbrook, could he then have rendered himself "disabled" by moving? Or to frame the question more accurately for purposes of judicial review, should this Court have forced the Appeals Committee to accept that proposition? Of course not.

15. Chandler's assertions in support of this claim are intermingled with his argument that UL improperly denied him benefits. But because an asserted violation of Section 1140 is an analytically discrete claim, this opinion will treat it in that fashion.

he would go out to these various plants and where driving was involved, if he was unable to drive, would that then constitute a disability that would entitle him to benefits?

A. For that particular job, yes, it could.

Continuing on that theme, Chandler Mem. 11 posits that although UL found that he could not drive long distances, it nevertheless transferred him from Park Forest "where he was doing a number of short type of trips" to Northbrook where he had "one long commute."

That is nothing more than an impermissible post-hoc-ergo-propter-hoc argument. There is not a shred of evidence that when Clinard, Hansen and Russell decided some time before February 5, 1991 to transfer Chandler, either they or anyone else at UL (or even Chandler, for that matter) knew that Chandler had a problem in driving long distances. Indeed, from the most extremely pro-Chandler view of the evidence, the earliest that it can be inferred that UL received notice of that problem was in April 1991 (some two months after his transfer), when UL limited his work day to six hours.

Nor is there anything to support Chandler's present contention (Mem. 3, 11) that he objected to the transfer because the resulting increased "commuting distance would worsen his condition." As the record indisputably reflects, Chandler raised no objections to his transfer. Instead he simply asked that he be returned to his job as a Senior Field Representative once his condition (his condition of health, not his capacity to drive) improved.

It is unnecessary to parse Chandler's other arguments in this area.[16] It is enough that he has utterly failed to come forward with evidence supporting the reasonable inference that he was transferred to prevent him from ultimately obtaining disability benefits. Summary judgment in UL's favor is also called for on Chandler's Complaint Count II.

---

16. Nonetheless this Court has done so, and it has found them unsupported by the record as well.

17. By this Court's independent calculation, that represents a material understatement. But given

### UL's Counterclaim

As the earlier quotation from the Plan's provisions reflects, its disability benefits are reduced by "primary and family Social Security Disability payments." And the *Facts* section of this opinion has said that on July 12, 1993 Chandler was granted social security benefits retroactively to February 8, 1991, while he received disability benefits under the Plan from February 12 to April 1, 1991, from April 7 to October 7, 1991 and from October 22, 1991 to August 3, 1992.

According to UL, that means Chandler received both social security benefits and Plan disability payments for "approximately thirteen months."[17] At approximately $900 a month for the social security benefits, the amount that UL claims is $11,700. Chandler never offers any argument to the contrary, nor does he dispute UL's figures. Consequently, UL is entitled to a judgment in the amount of $11,700 on its Counterclaim (as was true in *Donato*, 19 F.3d at 383).

### Conclusion

There is no genuine issue of material fact as to whether UL properly denied Chandler disability benefits under the arbitrary-and-capricious standard of review. Nor is there any genuine issue of material fact as to whether UL is entitled to a refund of $11,700 from Chandler. Accordingly this Court orders the entry of a judgment as a matter of law (1) dismissing Chandler's Complaint with prejudice and (2) awarding UL $11,700 against Chandler on its Counterclaim.

Chandler's acceptance of (or at least failure to contest) UL's figures, this opinion will do likewise.