George H. ZINN, Jr., Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, Defendant.

No. 96–CV–74332–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 29, 1997.

Keefe A. Brooks, Detroit, MI, for plaintiff.

Thomas Paxton, Detroit, MI, for defendant.

*OPINION AND ORDER REGARDING PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. INTRODUCTION

The above-captioned ERISA action is presently before the Court on three motions for summary judgment:

(1) Defendant's Motion for Summary Judgment;

(2) Plaintiff's Motion for (Partial) Summary Judgment on his "supplemental claim for disability benefits" in Count II of his Second Amended Complaint; and

(3) Plaintiff's Motion for Partial Summary Judgment for unpaid balance of his long-term disability benefits ($11,668.67) for the period of January 1, 1996 through March 15, 1996.

Plaintiff responded to Defendant's Motion for Summary Judgment on June 13, 1997. Defendant, however, has not filed any response to Plaintiff's Motions for Partial Summary Judgment.[1]

Having reviewed and considered the parties' motions, briefs and supporting documents, and having heard the oral arguments of counsel on September 11, 1997, the Court is now prepared to rule on the pending Motions. This Opinion and Order sets forth that ruling.

## II. FACTUAL BACKGROUND

Plaintiff George H. Zinn, Jr. is a shareholder in the Butzel Long law firm. Over the course of the past few years, Mr. Zinn has suffered an ever-increasing binaural hearing loss which caused him substantial difficulty to hear in multi-sound settings. As a result of his hearing loss, he became unable to perform his litigation duties and in March 1994 he was ultimately required to relinquish his litigation-related practice. This resulted in an ever-decreasing level of performance by Mr. Zinn in terms of producing billable hours and revenues for Butzel Long.

At the end of 1994, Butzel Long informed Mr. Zinn that his 1994 billable hours were approximately 70% of his expected performance. Therefore, the firm informed Zinn that it could no longer maintain his then current level of income and that it would be reducing base annual salary from $160,000 to $120,000. Given the disability caused by Mr. Zinn's hearing loss, and his consequent reduction in income, Mr. Zinn became eligible for long-term disability benefits under Butzel Long's group long-term disability insurance policy issued by Defendant UNUM Life Insurance Company of America.

The UNUM policy provides in pertinent part as follows:

DISABILITY

"Disability and Disabled" means that because of injury or sickness:

1. The insured cannot perform all of the material duties of his regular occupation; or

2. The insured, while unable to perform all of the material duties of his regular occupation on a full time basis, is:

    a. Performing at least one of the material duties of his regular occupation on a part-time or full-time basis; and

    b. Earning at least 20% less per month of his indexed pre-disability earnings due to the same injury or sickness.

Note: For attorneys, "regular occupation" means the specialty in the practice of law which the insured was practicing just prior to the date disability started.

\*   \*   \*   \*   \*   \*

When the Company receives proof that an insured is disabled due to sickness or

---

1. Defendant does address in its own Summary Judgment Brief, Plaintiff's "supplemental claim for disability benefits." However, Plaintiff's claim for the $11,668.67 which he contends remains unpaid on his original claim for benefits, has not been addressed at all by Defendant.

**1148**

injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued

1. disability; and
2. regular attendance of a physician.

\*   \*   \*   \*   \*   \*

TERMINATION OF BENEFITS
Disability benefits will cease on the earliest of:

1. The date the insured is no longer disabled . . .

\*   \*   \*   \*   \*   \*

RECURRENT DISABILITY
"Recurrent disability" means a disability which is related to or due to the same cause(s) of a prior disability for which a monthly benefit was payable.

A recurrent disability will be treated as part of the prior disability if, after receiving disability benefits under this policy, an insured:

1. returns to his regular occupation on a full time basis for less than six months; and
2. performs all of the duties of his regular occupation.

Benefit payments will be subject to the terms of this policy.

If an insured returns to his regular occupation on a full-time basis for six months or more, a recurrent disability will be treated as a new period of disability. The insured must complete another elimination period. . . .

Zinn applied for benefits under the UNUM policy on May 22, 1995. Along with the initial application, his employer (Butzel Long) submitted an UNUM "job analysis" form verifying that Mr. Zinn had been a litigation attorney but that, as a result of his hearing loss, his litigation case load was transferred to other attorneys. UNUM also received a completed "attending physician's statement" form from Dr. Michael Disher, an otolaryngologist at the University of Michigan Medical Center, dated June 6, 1995. Dr. Disher, who examined Mr. Zinn on November 11, 1994, diagnosed Mr. Zinn's condition as a "sensory neural hearing loss" with a "poor" prognosis for recovery. Dr. Disher opined that Mr. Zinn "may benefit from hearing assistance devices" and indicated that he had referred his patient for a hearing aid evaluation.

Upon receipt of all of the above-mentioned items, UNUM requested the files of various medical care providers Mr. Zinn in the past, in addition to Dr. Disher, concerning his hearing loss. Among the records provided in response to UNUM's request were three audiograms and evaluations thereof performed by on Plaintiff at the direction of Drs. William Rice and Robert Paul at the Lakeshore Ear, Nose and Throat Center in St. Clair Shores, Michigan in 1992 and 1993, and at the California Ear Institute at Stanford, in Palo Alto, California on May 12, 1995, i.e., shortly before Mr. Zinn applied for disability benefits.

From May 22 until November 10, 1995, UNUM had Plaintiff's application for benefits under consideration. UNUM's claim file of this matter indicates that during this period, UNUM made several requests of Butzel Long (and Plaintiff) for additional information which concerned verification of Mr. Zinn's decline in billable hours and decrease in salary.

In addition to requesting documentation of Mr. Zinn's billable hours over the preceding four years, UNUM further sought copies of "litigation logs" or a listing of all cases tried by Mr. Zinn since 1991 and the names of all of the parties in each suit to document the amount of trial work done by Mr. Zinn. [Defendant's Ex. 2, pp. 0213, 0223.]

With regard to this additional information, Joe Braz, UNUM's Senior Risk Specialist in Long Term Disabilities, directed Maureen Davis, the UNUM Disability Benefit Specialist assigned to Plaintiff's claim to obtain the additional information because he believed

> [T]here is always some suspicion when a 62 y[ear] o[ld] trial attorney cuts back his hours and files a partial dis[ability] claim as many attornies [sic] at that age do start to cut back regardless of their health.

[Defendant's Ex. 2, p. 0223]

Mr. Braz also suggested that Ms. Davis contact the appropriate state department of professional licensing to find out if Mr. Zinn's

license was in good standing or whether it was in jeopardy because of disciplinary action. *Id.*

During this six-month period, however, UNUM made no request for additional medical evidence of Plaintiff's claimed disability.

On November 10, 1995, Maureen Davis of UNUM wrote to Plaintiff and informed him that his request for disability benefits had been approved and sent him a check for $13,333.32 to cover payments due from June 30, 1995 (the first date he was eligible to receive benefit payments) through October 30, 1995. Thereafter, he received $3,333.33 per month for the next four months. However, on February 15, 1996, Mr. Zinn was notified by UNUM that his benefit payments were being terminated effective March 15, 1996.

During the period of November 1995 through February 1996, two significant things happened.

First, although she had approved Mr. Zinn's application for benefits, for some reason, within after few days of approving the application, on November 22, 1995, Ms. Davis requested a second medical review of Mr. Zinn's application. Her referral to UNUM's home office physician asked whether since Mr. Zinn was wearing a hearing aid, it was "reasonable that multi-sound settings [such as trial proceedings] would be problematic." [Defendant's Ex. 2, p. 0195.]

On December 12, 1995, one of UNUM's home office physicians, Dr. Charles Perakais, responded to the referral. Referencing the May 12, 1995 audiogram done on Mr. Zinn which indicated: "Mild sensorineural hearing loss thru 1000Hz/Moderate sensorineural hearing loss at greater than 1000 Hz/Bilateral", Dr. Perakais opined,

Based on the modern hearing aids available I do not feel this is significant enough hearing loss to conclude multi-sound settings would be problematic. An IME [in-

dependent medical examination] by an audiologist may be helpful.[2]
[Defendant's Ex. 2, p. 0194.]

Apparently relying on this advice, on January 19, 1996, Ms. Davis referred Mr. Zinn for a hearing test to Sabina Schwan of Comprehensive Audiology in Detroit.[3] Ms. Schwan submitted her report to UNUM on January 22, 1996. Based on her testing of Mr. Zinn's hearing, she recommended that he be fit for a ReSound BT2 hearing aid for his right ear (he was already wearing such a hearing aid in his left ear) and opined,

"With binaural ReSound amplification he should have minimal restrictions or limitations, **but I cannot be certain of that until he is evaluated binaurally....** Therefore, I recommend that Mr. Zinn obtain a ReSound hearing aid for the right **ear and be retested in the Sound Field aided condition with binaural amplification. It is necessary that he wear binaural aids for a few weeks to become adjusted to them before this testing is completed.**

Therefore, I feel that on the basis of the tests completed, Mr. Zinn should be able to perform with minimal difficulty in a court room situation or in an [sic] modest multi-sound background with the use of binaural ReSound hearing aids."
[Defendant's Ex. 2, pp. 0162–3.]

Ms. Davis referred Ms. Schwan's report to another one of UNUM's in house medical advisors, Dr. Leonard Sutton, for clarification of what Ms. Schwan meant by "minimal difficulty" in "modest multi-sound" environments. Dr. Sutton responded that he "would think" that "minimal difficulty" could mean missing "an occasional word" and that having the word repeated would solve the problem. [Defendant's Ex. 2, p. 0158.] However, he suggested that Mr. Zinn be re-tested in a multi-sound exposure after he obtained the second ReSound hearing aid. *Id.*[4]

---

**2.** Section IV(G) of the policy grants UNUM the authority to request that a claimant submit to an independent medical examination by a physician of its choice. That section provides:

The Company, at its own expense, will have the right and opportunity to have an employee, whose injury or sickness is the basis of a claim, examined by a physician or vocational expert

of its choice. This right may be used as often as reasonably required.

**3.** Ms. Schwan is not a physician nor does she have any medical training. She has a Master of Arts degree in speech and audiology.

**4.** Contemporaneous, Ms. Davis also referred Mr. Zinn's file for review by UNUM's retained vocational consultant, Linda Gels. In a three-sentence

UNUM's claim file indicates that Ms. Davis spoke with Ms. Schwan on the telephone on February 13, 1996 and was advised that Mr. Zinn was scheduled to be fitted for a second hearing aid in approximately two weeks, but that Ms. Schwan would want him to have a one-week trial wear of it and then return to see her to see if it would need any adjustments. [Defendant's Ex. 2, p. 0156.]

However, Ms. Davis did not wait for Mr. Zinn to be fitted for the new hearing aid, let alone for any adjustment period or any retest of his hearing in a multi-sound environment. Instead, two days later, on February 15, 1996, Ms. Davis wrote Mr. Zinn and informed him that his benefits were being terminated effective March 15, 1996 and with that letter sent him a check for benefits through that date.

At approximately the same time that UNUM's in-house medical advisors were initially asked by Maureen Davis to review Mr. Zinn's claim in December 1995, Butzel Long decided on December 22, 1995, to further reduce Mr. Zinn's annual compensation from $120,000 to $32,000, effective January 1, 1996. On December 28, 1995, the firm informed Ms. Davis of this further reduction and asked that UNUM "adjust Mr. Zinn's disability payments accordingly." [Defendant's Ex. 2, pp. 0184–5.] Under the terms of the UNUM policy [discussed *infra*] the decrease in Mr. Zinn's salary would mean a substantial increase in his monthly disability payments. However, UNUM never made any adjustment in Mr. Zinn's disability payments, even for the brief three and one-half month period remaining (i.e., through March 15, 1996) that it continued to pay benefits.

Instead, on January 5, 1996, Maureen Davis referred the matter to Bill Bristol, UNUM's CPA for review. In her referral, Ms. Davis pointed out to Mr. Bristol that Mr. Zinn's "billable hours from 1/1/95—11/1/95 have been approx[imately] 60% of expected and a[n] 80% loss of earnings does not[ ] appear to be justified." [Defendant's Ex. 2, p. 0180.] She further pointed out, "Of note is that a recent medical review has questioned whether his level of hearing loss should impact his hearing in multi-sound settings—which is the basis of this claim. We are in the process of getting an IME." *Id.* Therefore, she asked Bristol to "[p]lease review this file and offer any recommendations to help assess this claim from a financial perspective." *Id.*

Mr. Bristol reviewed the file on January 11, 1996. He opined that Mr. Zinn had not produced the level of "expected" billable hours since 1986, therefore, he thought it was hard to see what changed for him in 1994 that prompted Butzel Long to drop his salary to $120,000.[5] [Defendant's Ex. 2, pp. 0168–9.] Therefore, to assess the further 1995 decrease in Mr. Zinn's salary, Bristol requested additional payroll and billable hours records from Butzel Long, as well as a copy of the shareholder agreement that addresses shareholder disability. *Id.* That request was conveyed to Butzel Long in a letter dated January 17, 1996. However, before Butzel Long had an opportunity to assemble the requested additional records, UNUM decided to terminate Mr. Zinn's benefits. [See Defendant's Ex. 2, pp. 0065–66].

In accordance with the provisions of the UNUM policy, Mr. Zinn, through counsel, requested that UNUM review its termination of benefits decision. Zinn's file was accordingly forwarded to UNUM's Quality Review Section in Portland, Maine where a review of the decision was conducted by William

report, Ms. Gels stated that she had reviewed Mr. Zinn's file for

> the vocational implications of "minimal difficulty" with word clarity of a trial attorney with a history of hearing loss. Claimant is being currently fitted with RESOUND, a programmable hearing aide system which per medical opinion provided, results in "minimal difficulty" which can be alleviated by asking for repeat of word if necessary.
> Based upon review of medical, it would appear claimant could perform [his] own occ[upation.]

[Defendant's Ex. 2, p. 0154.]

5. UNUM's reference to an expected number of 1,750 billable hours for every year dating back to 1986 is based upon what Butzel Long said in its letter of December 1994 with respect to Mr. Zinn's not having attained that expected number of hours in 1994. However, there is nothing in the record to indicate that UNUM ever inquired or was provided with Zinn's "expected" billable hours for any year other than 1994.

Weeks beginning in July 1996. Mr. Weeks testified in his deposition that in reviewing a claim file, his job is "to review the denial to make sure we made a fair and accurate determination in light of the contract." [Weeks Deposition, Plaintiff's Ex. J., p. 21.] However, in conducting his reviews, Weeks does not always rely solely on what is in the claim file. He sometimes gathers additional information on his own, even though he stated that Quality Review benefit analysts "are responsible for making the [review] decision based on reviewing the decision that was previously made." *Id.* at 25–26; 27–28.

In the case of his review of the decision to terminate Mr. Zinn's benefits, Mr. Weeks did independently seek additional information from Sabina Schwan. *Id.* at 30. Although Weeks admitted that he had the names, addresses, telephone numbers, and fax numbers of all of Mr. Zinn's doctors, including Drs. Paul and Rice of the Lakeshore Ear, Nose and Throat Center and Dr. Disher at U of M, and had signed waivers in the file from Mr. Zinn entitling UNUM to obtain records from them, Mr. Weeks elected only to seek additional information from Ms. Schwan. *Id.* at 28–30.

Mr. Weeks asked Ms. Schwan to advise him whether Mr. Zinn had been provided with a second ReSound hearing aid and if so when, whether he had been tested with the new aid, and what the results of that re-test were. Ms. Schwan responded to Mr. Weeks request on August 8, 1996 and informed him that Mr. Zinn received his second ReSound hearing aid for his right ear on February 16, 1996, had a 60–day trial period with the new aid that expired on April 16th, and had been retested with ReSound hearing aids in both ears. [Defendant's Ex. 2, p. 0064.] Ms. Schwan's "retest" of Mr. Zinn apparently was not actually a full audiological assessment test. All that Ms. Schwan did was "test" both of Mr. Zinn's hearing aids when he received the new hearing aid for his right ear on February 16. [See Defendant's Ex. 2, p. 0064; Plaintiff's Ex. K. See also Schwan

Deposition, Plaintiff's Ex. R, p. 25.][6] According to Ms. Schwan, upon fitting him with the hearing aid for his right ear, Mr. Zinn showed a 24% improvement of his hearing with the hearing aids over her January 19, 1996 test. [Defendant's Ex. 2, p. 0064.] Based on this limited "test", Ms. Schwan adhered to her original opinion that "Mr. Zinn should be able to perform with minimal difficulty in a court room or in a modest multisound background while wearing binaural ReSound hearing aids." *Id.*

Based upon Ms. Schwan's August 8, 1996 letter and based upon the UNUM CPA's opinion regarding billable hours, on August 22, 1996, Mr. Weeks informed Mr. Zinn's attorney that UNUM had determined that its original decision to deny benefits was appropriate. [See Defendant's Ex. 2, pp. 0061–63.] In his letter, Mr. Weeks stated:

> Based on the information in your client's file, we are unable to reverse the decision to deny benefits. The medical information supports that your client has the ability to work as a Litigation Attorney with the use of his binaural ReSound hearing aids. Further the information in his file does not document a significant change in his billable hours as of the date he is claiming disability.

*Id.* at 0062–63.

Weeks' letter further stated, "If you have additional information in support of disability beyond March 15, 1996, please send it to the letterhead address and we will gladly review it." *Id.* at 0063.

Mr. Zinn did, in fact, send additional information to UNUM in the form of a "recurrent disability" claim on November 12, 1996. [See Defendant's Ex. 2, pp. 0041–51.] However, because by that time Mr. Zinn had already initiated the instant lawsuit, UNUM did not process, or even respond to Mr. Zinn regarding that claim. (It is this "recurrent disability" claim that is the subject of Plaintiff's

---

**6.** In her deposition, Ms. Schwan admitted that she did not perform any tests on Mr. Zinn after his hearing aid fitting on February 16, 1996 and that she used the same clinical results from the test that she did on him in January 1996 in writing her August 8, 1996 report to Mr. Weeks.

[Schwan Dep., Plaintiff's Ex. R, pp. 23–25.] Ms. Schwan further testified that she did not test Mr. Zinn after the 60 day trial period, and said she only does such a re-test if the customer complains to her about the hearing aids. *Id.* at pp. 24, 29.

Motion for Summary Judgment on Count II of his Second Amended Complaint.)

## III. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

\* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994).

### B. *STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES*

■ The Supreme Court has ruled that the standard of review in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or to construe plan terms:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. **Consistent with established principles of trust law, we hold that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a** *de* **novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.**

*Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 35 (1996 Supp.).

80 (1989) (emphasis added). Thus, it is clear that it is only if the benefit plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan", that the trial court may use an "arbitrary and capricious" standard in reviewing the administrator's claim determination.

The Sixth Circuit has broadly interpreted the *Firestone* court's holding. In *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir.1991), the court held that the ERISA plan in question does not have to give the insurer complete discretion with respect to the ultimate determination of benefit eligibility. *Id.* at 984, *citing, Bali v. Blue Cross and Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir.1989). However, under the *Miller* court's formulation of the rule, to satisfy the *Firestone* "grant-of-discretionary-authority" touchstone and trigger an "arbitrary and capricious" standard the benefit plan must grant the plan administrator the discretion

> "(1) to make reasonable requests for documentation *and* (2) to determine what evidence may be required to provide a basis for [benefit eligibility] determination."

925 F.2d at 984 (enumeration and emphasis added).

■ Defendant UNUM argues that it is entitled to an arbitrary and capricious standard of review in this case. UNUM bases this argument on its contention that because the language of the policy requires a claimant to "prove" his eligibility, the Court should find that the policy grants sufficient discretion to the plan administrator to warrant application of the less stringent "arbitrary and capricious" standard. In support of this argument, UNUM relies upon one Seventh Circuit Court of Appeals decision, *Patterson v. Caterpillar, Inc.*, 70 F.3d 503 (7th Cir.1995), and two Seventh Circuit district court opinions relying on *Patterson*,[8] in which the courts found that if a policy requires that a claimant *prove* that he is disabled, and that benefits will be paid only if the insured gives the company such *proof* the arbitrary and capricious standard is warrant-ed. The Sixth Circuit was called upon to construe essentially identical plan language in *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 825–26 (6th Cir.1996), and in that case, the Court determined that simply because the insurance company has the ability to require the claimant to furnish all required proofs, "written proof" or "satisfactory proof" of a disability before continuing benefits does not clearly give the insurance company discretion under *Bruch* to trigger the arbitrary and capricious standard. *Id.* Although Perez was reheard *en banc* on April 23, 1997 and the original appellate panel decision vacated pending the *en banc* decision, *see Perez v. Aetna Life Ins. Co.*, 106 F.3d 146 (6th Cir. 1997), the Court finds the vacated appellate decision instructive and agrees with the reasoning that merely requiring a claimant to provide "proof" of his claim does not clearly give a plan administrator such discretion under *Bruch* to trigger the arbitrary and capricious standard.

■ The Court has reviewed the UNUM policy at issue and finds no language in the policy which can be construed as clearly granting the insurance company the discretion to determine eligibility for benefits. Therefore, this Court finds that the Butzel Long–UNUM policy at issue in this case, and Defendant UNUM's determinations thereunder, are subject to a *de novo* standard of review.

■ Generally, the Court's review of Defendant's denial of Plaintiff's benefits claim is limited to the evidence previously presented to and considered by the plan administrator. *Miller v. Metropolitan Life Ins. Co., supra*, 925 F.2d 979, 986; *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir. 1990); *Crews v. Central States*, 788 F.2d 332, 336 (6th Cir.1986) (quoting *Wardle v. Central States*, 627 F.2d 820, 824 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)). *See also, Criss v. The Hartford Accident and Indemnity Co.*, 1991 WL 640066, *affirmed*, 963 F.2d 373 (1992).[9] This includes not only the evidence before the administrator at the time the original

---

8. *Bollenbacher v. Helena Chemical Company*, 934 F.Supp. 1015 (N.D.Ind.1996) and *Hagberg v. UNUM Life Insurance Company of America*, —— F.Supp. —— [1996 WL 934112] (E.D.Wis. Mar. 29, 1996).

9. The Court notes that this limitation applies to both an "arbitrary and capricious" standard or a *de novo* standard of review. *See Miller v. Metropolitan Life Ins. Co., supra*, 925 F.2d at 986 and cases cited therein.

decision to deny benefits was made, but also consideration of what occurred during the administrative appeals process. *Miller v. Metropolitan Life, supra,* 925 F.2d at 986.

In *McMahan v. New England Mutual Life Ins. Co.,* 888 F.2d 426 (6th Cir.1989), which was decided shortly after the Supreme Court's decision in *Firestone,* the Sixth Circuit reaffirmed its belief that ERISA review should be limited to facts presented to the plan administrator, but noted that the change in the standard of review might signal the need to revisit this question:

> While the *Firestone* Court's rejection of the "arbitrary and capricious" standard of review might argue for a reconsideration of *Crews,* we are bound by *Crews* as the law of this Circuit. Accordingly, in supplementing the record and reviewing *de novo* New England's denial of benefits, the district court should consider only the evidence that was available to New England at the time of its final decision in this case.

*McMahan,* 888 F.2d at 431, n. 1.

In *Perry,* the court revisited and reaffirmed *Crews:*

> Careful reconsideration of *Crews,* however, yields a determination that the *de novo* review required by [*Firestone v.*] *Bruch* is a *de novo* review of the record before the administrator or fiduciary, and that the reasoning of *Crews* is still sound.

*Id.* at 966.[10]

■ Applying the foregoing standards to the facts of this case, the Court finds that the evidence available to UNUM when it made both its original and final decision to terminate Mr. Zinn's disability benefits does not rationally support UNUM's determination that Mr. Zinn was not disabled, and there-fore, Defendant's Motion for entry of summary judgment in its favor will be denied.

Although UNUM claims to have relied upon "medical evidence" for its determination that Mr. Zinn is able to perform each of the material duties of a litigation attorney, the purported "medical" evidence was the report of Ms. Sabina Schwan, who is *not* a doctor and who has no medical training.[11] Further, even Ms. Schwan reported:

> In summary, Mr. Zinn has a mild-to-severe-sensorineural hearing loss bilaterally with poor speech recognition ability under earphones. This hearing loss is permanent, will not improve, and over time may progress further, especially with continued noise exposure.... Binaural amplification is the recommended treatment for this type of hearing loss. With binaural ReSound amplification he should have minimal restrictions or limitations, *but I cannot be certain until he is evaluated binaurally* ....

[Defendant's Ex. 2, p. 0163.]

Ms. Schwan therefore recommended that Mr. Zinn obtain a ReSound hearing aid for his right ear and be retested with the aids in both his left and right ear. However, she emphasized that, **"It is necessary that [Mr. Zinn] wear binaural aids for a few weeks to become adjusted to them before this testing is completed."** *Id.*

Ms. Davis made the original decision to terminate Mr. Zinn's disability benefits *before* Mr. Zinn was even fitted for his new hearing aid, let alone ever having his hearing re-tested. Mr. Weeks, too, affirmed that decision without any evidence of re-testing after an adjustment period.

---

**10.** However, in this case, Plaintiff has included in his Second Amended Complaint an allegation raising an issue of UNUM's self-dealing. [See ¶ 18 of Plaintiff's Second Amended Complaint "UNUM's unjustified reversal of position [determining that Plaintiff was not partially disabled] was arbitrary, capricious and made in utter bad faith, *motivated solely by a desire to avoid paying Zinn the higher monthly benefit he qualified for once his compensation was further reduced as of January 1, 1996.*"] Further, as discussed, *infra,* the Court finds that there is ample evidence in the record to support Plaintiff's allegation.

Neither *McMahan* nor *Perry,* nor any other Sixth Circuit ERISA cases addressing the issue of

scope of *de novo* review involved actions where it was alleged that the plan administrator's decision to deny benefits was motivated by self-interest. As discussed more fully *infra,* the Court believes that under these circumstances, the Plaintiff should be able to be permitted to expand the record at trial to ensure a fair review.

**11.** The Court notes that in sending Mr. Zinn to Ms. Schwan for an examination UNUM appears to have breached the terms of the policy. The policy provides that UNUM may have a claimant examined "by a **physician** or vocational expert." That Ms. Schwan is not a physician is evident even from the way she signed her reports, "Sabina Schwan, M.A., CCC–A."

With respect to Mr. Weeks' review of the decision to terminate Mr. Zinn's benefits, although Mr. Weeks testified that "it's not my job function to go out and get additional information. My job is to review the decision that has been made," Mr. Weeks did in fact take it upon himself to seek additional information in Mr. Zinn's case, but the *only* additional medical information he sought was from Ms. Schwan, UNUM's own hiree. He did not attempt to obtain additional information from any of Plaintiff's treating physicians, nor did he give Mr. Zinn an opportunity to respond to Ms. Schwan's August 8, 1996 report before making the decision to accept it at face value.

In *Reilly v. Blue Cross & Blue Shield United of Wisconsin*, 846 F.2d 416 (7th Cir. 1988), *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988),[12] the Seventh Circuit reversed the district court's grant of summary judgment in favor of defendant Blue Cross because it found that material issues of fact existed as to the basis of Blue Cross's decision to deny the plaintiff benefits because Blue Cross relied solely upon the its own internal Blue Cross–Blue Shield medical review physicians and considered no other evidence that was available to it at the time it made its denial of benefits determination.

With respect to UNUM's determination that Mr. Zinn's billable hours did not demonstrate that his work was affected by his hearing loss, as noted above, UNUM used Butzel Long's 1994 target 1,750 billable hours and applied that target to every year from 1986 through 1995 never having considered that that expected number of hours may well have been less in years prior to 1994, or more in years after. Further, this ten-year billable hours assessment with respect to the 1994 decrease in Mr. Zinn's salary was not made until after UNUM was informed that Mr. Zinn's salary had been substantially further decreased in December 1995 which, under the terms of the policy, would have necessitated an increase UNUM's monthly payments to him.

■ In reviewing the decision to terminate Mr. Zinn's benefits in this case, one of the factors that the Court must take into consideration in this case is the inherent conflict of interest presented. As the Sixth Circuit observed in *Miller*, where, as in this case, an insurance company serves as the decision-making fiduciary/administrator for employee benefits that are paid out of the insurance company's assets rather than the assets of an ERISA trust fund, "its fiduciary role lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial." 925 F.2d at 984. The *Miller* court determined that in such cases, courts are to weigh that conflict of interest as a factor in reviewing a denial of benefits determination. *Id.*[13]

**12.** *Reilly* was cited with approval by the Sixth Circuit in *Libbey–Owens–Ford Co. v. Blue Cross & Blue Shield Mutual of Ohio*, 982 F.2d 1031, 1035 (6th Cir.1993), *cert. denied*, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993).

**13.** *Miller* involved a denial of benefits review under the "abuse of discretion" standard. It does not appear that any Sixth Circuit cases address the conflict of interest issue in the context of a *de novo* review. However, recently, the Second Circuit was called upon to squarely address this issue in *DeFelice v. American International Life Assurance Co.*, 112 F.3d 61 (2nd Cir. 1997). The *DeFelice* court determined that when it is shown that the plan administrator has a serious conflict of interest, the normal limited scope *de novo* review is expanded and additional evidence not before the administrator at the time the decision to deny benefits was made should be considered. *Id.* at 65. The *DeFelice* court explained:

> The policy ... that district courts should not become "substitute plan administrators" is inappropriate where such a blatant conflict exists at the administrative level. In such circumstances, courts must exercise fully their power to review de novo and to be substitute administrators. Plaintiffs are utterly helpless against the whim of the conflicted body's interpretation of the facts. The normal scope of limited "de novo" review is inappropriate where the fairness of the ERISA appeals process cannot be established using only the record before the administrator.... In this situation, the district court may assume an active role in order to ensure a comprehensive and impartial review of the case.

112 F.3d at 66.

The Court agrees with the Second Circuit that where, as in this case, a serious conflict of interest exists, to ensure a comprehensive and impartial *de novo* review, additional evidence that could have been, and should have been, reviewed by Mr. Weeks may be considered. This evidence would include the opinions of Mr. Zinn's treating physicians of his condition at that time. Plaintiff

Considering the substantial conflict of interest presented in this case along with all of the other evidence before the benefits administrator, the Court finds that UNUM's decision to terminate Mr. Zinn's disability benefits was not justified. Notwithstanding the fact that even Defendant's own retained audiologist stated that Mr. Zinn's hearing loss was permanent, and getting worse, and needed to re-tested "a few weeks" after he obtained new hearing aids and had an opportunity to wear them for a period of adjustment, both Ms. Davis and Mr. Weeks summarily decided that Mr. Zinn was no longer disabled without any such re-testing. Indeed, Ms. Davis declared Mr. Zinn's benefits terminated before he was even fitted for a new hearing aid. The actions of both Ms. Davis and Mr. Weeks strike this Court as having been wholly arbitrary and motivated by UNUM's self-interest in its profit-making role as a business, as opposed to its fiduciary role as an ERISA plan administrator.[14]

Based upon all of the foregoing reasons, the Court finds that summary judgment in favor of Defendant UNUM is precluded in this case. The Court further finds that these same reasons preclude entry of summary judgment in favor of Plaintiff on his "recurrent disability" claim in Count II.

However, the Court finds that partial summary judgment should be granted to Plaintiff with respect to his claim for the unpaid difference in his January 1 through March 15, 1996 benefits based upon the December 1995 further reduction of his salary. There is no dispute that Plaintiff was during this time period, disabled. Plaintiff represents that the amount owing is $11,668.67, plus interest. Defendant has not responded to this partial summary judgment motion and offered no basis in its own summary judgment brief or at oral argument for not paying the increased amount.

may present this evidence to the Court with its "Proposed Findings of Fact" for trial.

**14.** Indeed, the Court believes that the conduct of UNUM in this case raises serious problems with respect to UNUM's fiduciary duties as an ERISA plan administrator. ERISA requires that plan fiduciaries provide a "full and fair review of claim denials." 29 U.S.C. § 1133(2). Further,

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment on Count II of his Second Amended Complaint is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment for the unpaid amount owing to him for disability benefits from January 1 through March 15, 1996 is GRANTED.

This case, accordingly, shall proceed to trial.

Therefore,

IT IS FURTHER ORDERED that within 14 days of the date of this Order, the parties shall submit to the Court their respective "Proposed Findings of Fact and Conclusions of Law" for trial.

§ 1104(A) requires that a fiduciary "discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries and for the exclusive purpose of (I) providing benefits to participants and beneficiaries and (ii) defraying reasonable expenses of administering the plan. . . ."